669 P.2d 1005

**John S. DAVIS, Plaintiff/Appellee,**

v.

**TUCSON ARIZONA BOYS CHOIR SOCIETY, an Arizona corporation, Defendant/Appellant.**

**No. 2 CA–CIV 4634.**

Court of Appeals of Arizona, Division 2.

May 26, 1983.

Rehearing Denied June 28, 1983.

Review Denied Sept. 22, 1983.

Gaynes & Rockafellow, P.C. by Randall M. Sammons, Tucson, for plaintiff/appellee.

Slutes, Browning, Sakrison & Grant, P.C. by William D. Browning, Tucson, for defendant/appellant.

OPINION

BIRDSALL, Judge.

This appeal is from a judgment in favor of John S. Davis and against the appellant, Tucson Arizona Boys Choir Society, a non-profit corporation (Chorus). The judgment was in the amount of $23,000, $16,500 as damages, apparently under a contract provision for liquidated damages in the event of wrongful discharge, and $6,500 for attorney fees. Davis was employed as the Director of the Chorus.

The case was tried to the court sitting without a jury and no findings of fact were requested or made. Consequently, we must attempt to determine why the trial court reached its decision. We must view the evidence in the manner most favorable to sustaining the judgment. If, in so doing, it is necessary to resolve conflicts in the evidence, we must accept as fact that evidence which supports the judgment. *Jerger v. Rubin,* 106 Ariz. 114, 471 P.2d 726 (1970); *O'Hern v. Bowling,* 109 Ariz. 90, 505 P.2d 550 (1973).

The facts necessary to an understanding of the issues include the following. Additional facts are discussed in connection with the issues presented. In June 1975 Dr. Davis, then living in North Carolina where he was an Associate Professor of Music at a small college, received a telephone call from the president of the Board of Directors of the Chorus offering him the job as Director. After coming to Tucson for an interview, Davis decided to take the job, and moved his family here that summer of 1975.

The Tucson Boys Choir Society is a non-profit corporation with the objective of de-

veloping the personal character and musical skills of talented Tucson boys. It was founded in 1945. The operation of the Society is governed by its by-laws, as amended in 1980, which provide for a Board of Directors, Officers, and a Musical Director. Those by-laws state that ⅓ of the members of the Board constitute a quorum, and that a vote of the majority of a quorum constitutes the act of the Board for the purpose of conducting business. The meaning and effect of this provision was one of the matters disputed by the parties.

Between 1975 and 1980, Davis served as Musical Director of the Chorus, and also handled certain business matters. He took care of booking the concert tours that were taken by the Chorus each year, ordering the trees for the annual Christmas tree sale, and assisted in the preparation of the yearly budget. He also handled the arrangements for the yearly summer camp attended by the boys in the Chorus.

Davis' first contract with the Board was for a two-year probationary term of employment. This term lasted from the summer of 1975 until the summer of 1977. For the years 1977, 1978 and 1979, Davis entered into written contracts of employment which all had essentially the same terms, except for the amount of salary and the date of commencement. The contract did not expressly provide that it had a certain period of duration or would terminate on a certain date.

The material paragraphs of the contract, using the 1979 agreement, were:

"WHEREAS, the Society is desirous of continuing the employment of the Director for the purpose of teaching and directing certain boy choir groups; and WHEREAS, the Director is desirous of rendering his continued service as a teacher and director of those certain boy choir groups;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

1. TERM: This contract shall commence on the 1st day of July, 1979. If either party wishes to terminate this contract, termination notice must be received no later than the 1st day of May, any year, to be effective on the last day of June.

2. COMPENSATION: The Director shall receive as compensation for the term of this contract:

A. The sum of Twenty-Four Thousand Two Hundred ($24,200.00) Dollars per year. The Director shall receive Twenty-Two Thousand ($22,000.00) Dollars in salary payable on a bi-weekly basis during the term of this contract subject, however, to all terms of this contract.

B. In addition to the salary, the Society will pay Two Thousand Two Hundred ($2,200.00) Dollars to the Teachers Insurance and Annuity Association for retirement . . . .

3. NEGOTIATION FOR CHANGES IN CONTRACT: It is mutually agreed between the parties hereto that any negotiations for increases in compensation or other changes in contract will begin on or about the 1st day of April.

⋅ ⋅ ⋅ ⋅ ⋅

8. TERMINATION OF CONTRACT: The Society shall have the right by and through the action of the Board of Directors to remove the Director for neglect of duties or inappropriate behavior.

9. WRONGFUL DISCHARGE: In the event the Society shall wrongfully discharge the Director for any reason, then and in that event, the Society shall pay to the Director all compensation which would have been earned by the Director from the time of wrongful discharge until the last day of the following June.

10. ENFORCEMENT OF CONTRACT: In the event of suit, the prevailing party shall be entitled to all costs expended as well as reasonable attorney's fees incurred as a result thereof."

The last contract commenced July 1, 1979. During its budget planning in the fall of that year the Board included an increase in salary for Davis for the year 1980. This

was the same procedure that had been followed every year. The salary increase was then incorporated in his "new" contract signed sometime after July 1 of each year. In fact he would commence drawing this new salary on July 1 even though the new contract had not yet been approved, prepared and signed. This same procedure was not followed in 1980. In June, Davis discussed a "new" contract with the executive committee. On July 28th he met with the Board. He had been presented with a proposed new contract containing a salary increase and additional compensation in the form of a bonus. The increase and bonus approximated the amount included in the budget. However, the payment of the bonus was subject to the discretion of the Board based upon performance criteria to be established.[1] He was dissatisfied with these provisions and voiced his objections. He was temporarily excused while the Board ostensibly discussed the matter further. Instead of standing by the changes discussed or making an offer, the Board voted to terminate Davis and he was so notified. The vote was 11 to 4, 15 out of 28 directors (a quorum) were present.

This action followed, with Davis claiming that he was still employed under the agreement commencing July 1, 1979, and that since the Board wrongfully discharged him, he was entitled to the liquidated damages.

The issues are presented in the appellant's brief as:

1) Was John Davis, in the summer of 1980, operating under the 1979 contract on a continuing basis, or had the 1979 contract been waived or abandoned, making Davis an employee at will?

2) Should Davis be allowed to assert the continuing existence of the 1979 contract subsequent to June 30, 1980, or is he estopped by his own statements and conduct?

3) Assuming arguendo that Davis was operating, in the summer of 1980, under the 1979 contract on a continuing basis, was the action of the Board of Directors on July 28, 1980 a valid, good faith termination for cause under the terms of the 1979 contract?

4) Was the vote of the Board of Directors on July 28, 1980 a valid act under the provisions of the By-Laws?

5) Assuming that Davis was wrongfully discharged, is the liquidated damages clause in the 1979 contract lawful and applicable, or is it void as a penalty?

*Waiver*

We believe that the trial court must have concluded that the appellee was working beyond June 30, 1980 under the 1979–80 contract. We believe such a conclusion is warranted from the language of the contract, the conduct of the parties and the circumstances. Although the contract does not expressly provide that it is to "continue", there are several provisions which lend credence to that construction. Foremost is the sentence in paragraph 1, "Term", requiring either party to give notice before May 1st of any year if the contract is to be terminated. Also we note paragraph 3 that "negotiations for increases in compensation or other changes in contract will begin on or about the 1st day of April". These provisions contemplate a continuing relationship between the Chorus and the Director.

The circumstances of the parties when Davis was first employed support an inference that more than one year's employment was intended. The appellant argues that the parties mutually waived the contract provision for termination notice prior to May 1st and therefore the contract was terminated each year by mutual assent. In fact it argues that on June 2, 1980, Davis "submitted a termination notice". That is a possible inference from the testimony; however, the trial court believed that Davis was merely "negotiating" for better terms of employment as he had in the past. Davis testified that all he wanted was more mon-

---

1. The new contract also contained an express "Term of Contract" provision:

"This is for the period July 1, 1980 through June 30, 1981. The parties agree that no re- newals nor extensions are granted by this contract. Any renewal or extension must be made in writing by the parties."

ey; that he believed his contracts were continuing. The evidence which might establish waiver by conduct, i.e., the relinquishment of a known right, *see City of Tucson v. Koerber*, 82 Ariz. 347, 313 P.2d 411 (1957), was in conflict. The trial court must have believed that the 1980 conduct was no different than the previous years. Such a belief is logical under all the evidence. The appellant's argument that because neither party ever gave a termination notice by May 1st the contract necessarily terminated every year escapes us. This evidence supports a finding that the contract was never terminated.

The appellant contends that the result reached by the trial court is absurd since the appellee is permitted to reject a raise and then fall back on a contract without such salary increase. This contention necessarily rests upon a finding that the appellee did, in fact, reject the new contract. Competent evidence leads to a different conclusion. The appellee testified he did not tell the Board he would not accept the new contract, he only said he would like to see it changed ("I never told them I wouldn't accept anything."). The trial court not only found by implication that the new contract was not rejected, it commented in ruling on an objection near the close of evidence that the contract was never offered to the appellee. Obviously if it was not offered it could not be rejected.

The appellant places great reliance on the following evidence admitted from the appellee's deposition, arguing it shows a rejection of the "new" contract:

"Q. What discussions were had between you and the board while you were in attendance relating to the contract?

A. (by Davis) I expressed I (sic) concern about the amount, years. I believe it was a four percent raise and I thought it was inadequate and objected to the paragraph which—where was it, the one about the bonus. The society may pay the director a bonus which should be based upon performance criteria established by the society. And I said I would object to signing a contract where a bonus would be based on unspecified criteria at this point."

However, the trial court apparently believed this was just "negotiation talk." We cannot fault such a conclusion.

The appellant also argues that since the contract contained no "term" the appellee was employed "at will" after June 30. From this it contends that he could be discharged without cause. *Rogers v. Hecla Mining Company*, 120 Ariz. 612, 587 P.2d 1189 (App.1978). This conclusion would depend on a finding that the contract was not continuing. As we have discussed, the trial court implicitly found the opposite, and this finding is amply supported by the evidence.

### Estoppel

██ This argument rests on the proposition that the appellee took the position that he was not under contract after June 30th when bargaining for more compensation and then abandoned this position after his discharge. Since the appellant relied on this, the argument goes, the appellee is estopped to change his position. *City of Tucson v. Koerber, supra.* The problem with this argument is the evidence supports a finding that the parties were only bargaining as in the past, and the contract was still extant.

### Abandonment

██ The appellant also argues that the parties abandoned their written contract. This is a matter of intention. *Diamos v. Hirsch*, 91 Ariz. 304, 372 P.2d 76 (1962). The evidence supports a finding that no abandonment was intended and once again we are not free to second guess the trial judge.

### Discharge for Cause

The contract provided that the appellee could be discharged for neglect of duty or inappropriate behavior. There was evidence of discipline problems, some poor musical performances, poor business judgment, etc. However, as could be expected, there was a conflict in this evidence. Whether

the Board had cause is a question of fact, and the trial court implicitly found it did not. The appellant contends that as long as it acts in good faith it does not matter whether the appellee had neglected his duties or been guilty of inappropriate behavior. The appellant is wrong. The appellant relies on *Bentson Contracting Company v. Lewis*, 83 Ariz. 110, 317 P.2d 545 (1957). In that case the employment was found to be at will, thus the holding that the employer only act honestly and in good faith. Likewise, *Moore v. Home Ins. Co.*, 601 F.2d 1072 (9th Cir.1979) (interpreting Arizona law) involves an "at will" employment situation.

### The Director's Vote

■ We are at a loss to understand the significance of this issue. It involves an interpretation of Sections 4 and 7 of the appellant's by-laws.

Section 4 provides:

"*Section 4, Removal of Director.* The President with the consent of two-thirds (⅔) of the Board of Directors shall have the right to remove the Director for neglect of duties or disrespectful behavior at any time."

and Section 7 reads:

"*Section 7, Quorum.* One-third (⅓) of the members of the Board of Directors shall be required to constitute a quorum for the transaction of business at any meeting and the act of the majority of the directors present at any meeting at which a quorum is present shall be the act of the Board of Directors."

The act of the Board was in accordance with its by-law provisions. It was nevertheless "wrongful" since no cause existed.

### Liquidated Damages

The appellant argues that the trial court should not have awarded liquidated damages pursuant to the contract provision since the actual damages were neither uncertain nor difficult to prove. *See* Dobbs, Remedies, Sec. 12.5 (1973). It also contends that the award of damages constituted a penalty. *See Babbitt Ford, Inc. v. Navajo Indian Tribe*, 519 F.Supp. 418 (1981 D.Ariz.). The trial court's award was determined by calculating the balance remaining on the appellee's salary to June 30, 1981, exactly as set forth in the contract. He was immediately employed as a music teacher at a local high school where he was paid almost $19,000 annually, almost as much as with the Chorus. The appellant argues that the amount of his damages is easily determined to be the difference in the salaries to June 30, 1981. It relies on *Perry v. Apache Junction Elementary Sch. Dist. # 43 Bd. of Trustees*, 20 Ariz.App. 561, 514 P.2d 514 (1973); *Chapin v. Klein*, 128 Ariz. 94, 623 P.2d 1250 (App.1981); *Fogleman v. Peruvian Associates*, 127 Ariz. 504, 622 P.2d 63 (App.1980). These cases did not involve provisions for liquidated damages and are therefore inapposite.

■ Our court has consistently held that where a contract contains a provision for liquidated damages the contract will control. *Roy H. Long Realty Company, Inc. v. Vanderkolk*, 26 Ariz.App. 226, 547 P.2d 497 (1976); *Miller v. Crouse*, 19 Ariz. App. 268, 506 P.2d 659 (App.1973). This general rule is properly qualified by adding "provided the amount of the damages is reasonable." 25 C.J.S. Damages, Sec. 113(6). The liquidated damages arising out of employment must bear some proportion to the breach. *Ibid.* Where the damages are graduated in accordance with the time remaining on the contract they are more readily upheld. *Anderson v. Cactus Heights Country Club*, 80 S.D. 417, 125 N.W.2d 491 (1963). A contract calling for one year's salary was upheld as liquidated damages in *Zeppenfeld v. Morgan*, 185 S.W.2d 898 (Mo.App.1945). Although the appellant's argument here is appealing since it does appear that the appellee will not be required to mitigate his actual damages and may profit from the incident, this is not necessarily so. It must be remembered that the appellee gave up another position and moved with his family across the country. The other position was teaching on a college level. These facts may well

have been in the parties' minds when the contract was made. *See Zeppenfeld, ibid.*

The provision here is a reasonable endeavor to ascertain in advance what the damages would be from a wrongful discharge. This is a factor to be considered. *McCarthy v. Tally,* 46 Cal.2d 577, 297 P.2d 981 (1956). *See also* Dobbs, Remedies, Sec. 13.5 (1973). The damages are not penal, they are reasonably proportionate to the loss, and the trial court was correct in holding the parties to their bargain.

Affirmed.

HOWARD, C.J., and HATHAWAY, J., concur.