701 P.2d 587

**LARSON–HEGSTROM & ASSOCIATES, INC., d/b/a Indevco Realtors, an Arizona corporation, Plaintiff/Appellant,**

v.

**James B. JEFFRIES and Norma Jane Jeffries, husband and wife, Defendants/Appellees.**

No. 2 CA–CIV 5015.

Court of Appeals of Arizona, Division 2.

Jan. 11, 1985.

Reconsideration Denied March 28, 1985.

Review Denied June 4, 1985.

Dennis A. Rosen, Tucson, for plaintiff/appellant.

DeConcini, McDonald, Brammer, Yetwin & Lacy, P.C. by David C. Anson and Michael R. Urman, Tucson, for defendants/appellees.

## OPINION

HATHAWAY, Judge.

Are appellees (Jeffries) obligated to pay a 6% brokerage commission under an exclusive listing of a shopping center after they transferred the property to a church for $10 "and other valuable considerations." Under the facts of this case, we find that they are.

Appellant (Indevco), an Arizona corporation engaged in selling real estate, entered

a real estate agreement with appellees, exclusively authorizing Indevco to list for sale and to sell the Groves Shopping Center in Tucson for $2.5 million dollars. The property was encumbered to Great Southern Life Insurance Company for $1.5 million dollars. The term of the listing agreement was from November 24, 1978, to October 1, 1979, during which time Indevco had the exclusive right to sell the subject property. Paragraph 3 of the agreement details the conditions for payment of the commission to Indevco.

"3. This contract is to remain in full force and effect and be irrevocable by me or us to and including the 1st day of October of 1979, and I or We agree to pay you a brokerage fee of 6% of the above gross sales price, or any other consideration agreed to by me or us, (1) in the event you procure a bona fide offer from a purchaser ready, willing and able to purchase said property at the price and upon the terms above set forth, *or* (2) in the event a sale or exchange is made by me or us directly or through any other source or whether said property is transferred, conveyed, leased, or withdrawn from sale without your written approval...." (Emphasis added)

Viewing the evidence adduced at the bench trial most favorably to appellees, the evidence discloses that on December 27, 1978, the Jeffries quitclaimed the property to the Progressive Baptist Church (Church) of Los Angeles. The deed, recorded February 23, 1979, during the listing term, recited "for the consideration of Ten and 0/100 Dollars, and other valuable consideration." After the transfer, the Jeffries remained liable on the $1.5 million dollar mortgage payable to the Great Southern Life Insurance Company. Both before and after the transfer, Indevco attempted to find a buyer for the property at $2.5 million dollars, although they conceded that the likelihood of finding a buyer at that price was remote. Indevco testified that three separate offers of $2.4 and $2.0 million were presented to the Jeffries in the course of the listing agreement. The court admitted testimony concerning the $2.4 million offer

"for the limited purposes of showing that the plaintiffs attempted to use its best efforts in effectuating a sale."

After the trial, the court made findings of fact and conclusions of law. It found that $10 was the only consideration for the transfer to the church and accordingly, determined that Indevco was entitled to 6% of the $10 as a commission, i.e., $.60. It also found that Indevco was not entitled to a commission on the amount of the mortgage to Great Southern Life Insurance Company, since the Jeffries remained liable on the debt. The court concluded alternatively that "[t]he contract clause providing for full commission of six percent (6%) of the listing price if the owner withdraws the property from sale is an unenforceable penalty clause under the facts in this case."

Indevco questions on appeal (1) whether the listing agreement was ambiguous, (2) whether it was unenforceable as a penalty, and (3) whether there were other considerations upon which to base a 6% commission as provided in the listing agreement.

## IS THE AGREEMENT AMBIGUOUS?

■ The agreement states clearly that the Jeffries agree to pay 6% of the above gross sales price or 6% of any other consideration agreed to by the Jeffries should Indevco provide a bona fide offer at the listed price ($2.5 million), should the Jeffries sell or exchange it, *or* should the property be *conveyed or withdrawn from sale*. While there is conflicting testimony concerning the relationship between the Jeffries and Indevco, there is no ambiguity in determining what triggers the sellers' obligation to pay the brokerage fee. Withdrawal of the property from sale within the period of the listing agreement triggers the obligation to pay the 6% commission. *Geyler v. Dailey*, 70 Ariz. 135, 217 P.2d 583 (1950). What is ambiguous in this case is the exact value of the consideration on which the 6% commission was to be based. The trial court's conclusion of law, that the agreement is ambiguous as to what *triggers* that portion of the contract which

states 6% of any consideration, is in error. The Jeffries clearly withdrew the subject property from the agency agreement with Indevco when they sold or gave it to the Progressive Baptist Church on December 27, 1978.

## WAS THE $10 THE SOLE CONSIDERATION?

If the triggering mechanisms are unambiguous as well as the 6% figure, then the only question remaining is the meaning of "consideration" in the listing agreement on which the 6% commission is to be based. The trial court found, as a matter of law, that $10 was the only consideration received by the Jeffries for the transfer of the property to the church. We agree with appellant that the trial court erred in not considering the "other valuable considerations" accompanying the $10 in the quitclaim deed of December 27, 1978, and the quitclaim deed of February 23, 1979.

In general, "valuable consideration" implies a benefit to the promisor or detriment to the promisee. *Sapp v. Lifrand*, 44 Ariz. 321, 36 P.2d 794 (1934). Monetary consideration is not required; any benefit or detriment is sufficient, *Mack v. Coker*, 22 Ariz.App. 105, 523 P.2d 1342 (1974). Black's Law Dictionary (5th ed.) defines consideration as "[s]ome right, interest, profit, or benefit accruing to the party, or some forbearance, detriment, loss or responsibility, given, suffered, or undertaken by the other." Id. at 277. When the church agreed to take the Groves Shopping Center, encumbered by a $1.5 million loan and thousands in back taxes for which it became directly liable as title holder, and when the church assumed the multiple headaches of a landlord of a deteriorating property, it undertook a legal problem of enormous proportions.

At the same time, the Jeffries received the benefit of an additional entity, the Church, having an interest in seeing that mortgage payments were made to the lienholder. The finding of fact in the trial court, that defendants Jeffries remained liable on the $1.5 million debt, in no way eliminates the valuable consideration which flowed to the Jeffries from the Church in the form of an interested party (upon transfer of title to the church). Even if the church had no legal liability to Great Southern, having taken the property subject to the underlying lien, the Church certainly had an interest in seeing that its shopping center would not be lost by foreclosure. We hold, as a matter of law, that the involvement of the Church in the fortunes of the shopping center upon assumption of the status of an interested party through conveyance of the deed constituted valuable consideration in the amount of the lien, $1.5 million.

The value of the interested party in possession of title but not liable on the underlying lien was recognized in *Patton v. First Federal Savings and Loan Association*, 118 Ariz.App. 473, 578 P.2d 152 (1978). The supreme court found in that case that with a transfer of title and possession, without transferring liability on the underlying loan, "[t]here are now two persons motivated to protect the property and to make payments on the First Federal loan; before the transfer, First Federal could look only to Mrs. Patton to take care of the property and repay the loan." 118 Ariz. at 478, 578 P.2d at 157. (Since this is a commercial property, occupancy is not a factor as in *Patton.*) The principle of the interested party enunciated in *Patton* remains.

This court declines appellant's invitation to consider the tax benefit, if any, to the Jeffries upon the transfer to the church four days before the end of the 1978 tax year. A remand to the trial court for proceedings to determine if the value listed in the Jeffries' income tax returns varied from the affidavit of value signed by Mrs. Jeffries accompanying her quitclaim deed would launch the question of consideration into the Never Never Land of incidental benefits. Neither appellant nor appellee has cited any cases which support such an inquiry. Undoubtedly the Jeffries experienced a tax benefit through a charitable deduction, if they experienced any taxable

income in that tax year. But such an inquiry is fraught with uncertainties which this court is unwilling to pursue when offered no authority on which to base such an inquiry. And it is unnecessary here, where a dollar figure, namely the amount of the lien, can be logically attached to the benefit accruing to the promisor. The Jeffries acquired a new, interested party, motivated to protect the shopping center, on which they remained liable, when they conveyed title to the Church. By enlisting a new ally to protect that interest, either through involving the Church in management and payment efforts, or in the search for yet another new owner, the Jeffries valuably protected their remaining interest in the shopping center, their obligation to Great Southern for $1.5 million. Thus $1.5 million plus the $10 expressly mentioned constitute valuable consideration on which the 6% fee should be based.

■ An additional amount to figure into the basis for the 6% is the $25,000 which flowed to Mrs. Jeffries upon re-transfer of title from her through the second quitclaim deed to the Church on the occasion of the Church's sale of the subject property to a Phoenix investor, REACO. Mr. Jeffries asserts that this $25,000 paid at closing was in repayment of a debt owed by the Church to the Jeffries. Indeed, the Jeffries were longtime "benefactor[s]" of the Church, who gave the Church something anytime it wanted it, if the Jeffries had something to give. Mr. Jeffries testified that not only was the $25,000 a loan to the Reverend Cox, but that "we loaned him more than that, to keep his church afloat." There is no question that when the Jeffries quitclaimed the shopping center to the Church, they were aware of the monies owing to them. The renewed and increased possibility of repayment of those loans through the efforts of the new title holder, the Church, a possibility which became a reality at the time of the second quitclaim deed and sale to REACO on February 23, constitutes consideration as valuable as a shared interest in a property, see Patton, supra, or

enabling an individual to purchase property he would not otherwise have qualified to purchase. See *Cavanagh v. Kelly*, 80 Ariz. 361, 297 P.2d 1102 (1956). This renewed possibility can be valued concretely in the amount of $25,000 which directly passed to Mrs. Jeffries upon the sale from the church to REACO in exchange for her second quitclaim deed. Thus, the total amount of valuable consideration to which a dollar amount can be assigned and upon which the 6% may be based is $10 plus $1.5 million plus $25,000. The total of $1,525,010 generates a real estate commission of $91,500.60.

## IS THE CONTRACT CLAUSE AN UNENFORCEABLE PENALTY?

■ If a forfeiture clause is in the nature of a penalty, rather than liquidated damages, it will not be enforced, in the absence of a showing of actual damages. *Miller Cattle Company v. Mattice*, 38 Ariz. 180, 298 P. 640 (1931). The test for whether a contract fixes a penalty or liquidated damages for a breach is whether payment is for a fixed sum or varies with the nature and extent of the breach. Id.

■ In analyzing the enforceability of contract provisions such as the one at issue in this case, the rule followed in Arizona and elsewhere is that an agreement made in advance of a breach is a penalty, unless both of two conditions are met. First, the amount fixed in the contract must be a reasonable forecast of just compensation for the harm that is caused by the breach. Second, the harm that is caused by any breach must be one that is incapable or very difficult of accurate estimation. Restatement (Second) of Contracts, § 356; Restatement (First) of Contracts, § 339; *Marshall v. Patzman*, 81 Ariz. 367, 306 P.2d 287 (1957); *Illingworth v. Bushong*, 297 Or. 675, 688 P.2d 379 (1984).[1] Whether each of these requirements is met must be determined in light of all the facts and circumstances in any given case. See *Marshall v. Patzman*, supra.

1. See also Annot., 69 A.L.R.3d 1270, et seq.

▬ In the instant case, the 6% of consideration compensation can be reasonably viewed as a genuine pre-estimate of injury. The 6% figure was arrived at through negotiation, according to testimony by the Indevco president, Mr. Clements. It was unquestionably bargained-for. In addition, the base figure on which the 6% was to be calculated was either the listing price, if sold at full price, or "any other consideration agreed to" *by the Jeffries,* if sold at a lower price or withdrawn or conveyed. The Jeffries, as owners of a multi-million dollar shopping center, were in no way unequal bargaining partners to the real estate company. Mr. Jeffries testified that he had experience signing agreements of various types as part of his construction business and leasing of apartments he had built. He stated categorically that he read and understood the management and listing agreement prior to signing. Mr. Jeffries was far more knowledgeable in real estate matters than the average homeowner who may default on a listing agreement. See *Blank v. Borden,* 11 Cal.3d 963, 115 Cal.Rptr. 31, 524 P.2d 127 (1974).

▬ What is a reasonable forecast is a more difficult test to administer. Using a standard of just compensation, surely a negotiated fee of 6% of whatever the Jeffries got when they conveyed a property that was, by their own admission, a problem to maintain and operate, is not disproportionate in light of the reasonable efforts made by Indevco stipulated to by appellee. Real estate agents are universally entitled to a percentage compensation when they produce a ready, willing and able buyer at the listed price or the seller withdraws the property for sale. See *Chumney v. Stott,* 14 Utah 2d 202, 381 P.2d 84 (1963); *Seattle Investment Company v. Kilburn,* 5 Wash. App. 137, 485 P.2d 1005 (1971); *Brown v. Miller,* 45 Ill.App.3d 970, 4 Ill.Dec. 649, 360 N.E.2d 585 (1977); *Berven Co. v. Newman,* 281 N.W.2d 268 (S.D.1979); *Blank v. Borden,* supra. In addition, Mr. Jeffries admits that offers were communicated to him for the property at $2.4, $2.0 and $2.05 million, although it is disputed whether these offers were "accepted" or withdrawn because of feet-dragging on the part of the Jeffries or Indevco. Six percent of consideration received is not an unreasonable forecast of what would constitute just compensation in the event of a breach of contract.

▬ The second part of the penalty test is whether the harm caused by the breach is one that is incapable or very difficult to accurately estimate. Restatement of Contracts, § 339(1) (1932); *Wright v. Schutt Construction Co.,* 262 Or. 619, 500 P.2d 1045 (1972). Compensation associated with real estate contracts is by its nature difficult to estimate since what is being compensated is the presentation of a ready, willing and able buyer, regardless of any real effort or expenditures on the part of the agent. When the seller unilaterally withdraws the property from the hands of its agent and conveys it himself, he has deprived the agent of his *opportunity* to present the requisite buyer under the terms of the agency.

> "If ... we view the owner's exercise of a withdrawal-from-sale clause as an anticipatory 'breach' of the main contract, the 'damage' sustained by the broker would not be measured in the amount of effort expended by him prior to the 'breach' but rather would be measured in terms of the value of the lost *opportunity* to effect a sale and thereby receive compensation." *Blank v. Borden,* supra, 524 P.2d at 132 (Emphasis in original)

Thus while the amount of damages may be computed in a real estate withdrawal situation, the basis for determining the compensation—the lost opportunity to market under the terms of the agency—is "difficult of accurate estimation." Restatement of Contracts, § 339(1) at 552 (1932). Because the real estate commission was a reasonable forecast yet difficult of accurate estimation, it passes the two-part test as liquidated damages or as a claim for indebtedness under the specific terms of the contract, see *Blank v. Borden,* supra, and is not a penalty.

Reversed.

BIRDSALL and HOWARD, JJ., concur.