RAMADA FRANCHISE SYSTEMS, INC., Plaintiff,

v.

MOTOR INN INVESTMENT CORPORATION, a Georgia Corporation, Lewis Broadcasting Corporation, a Georgia Corporation, and J. Lewis, Jr., Defendants.

Civ. A. No. 490–140.

United States District Court, S.D. Georgia, Savannah Division.

Jan. 11, 1991.

Nolan B. Harmon, Atlanta, Ga., Paul W. Painter, Jr., Savannah, Ga., for plaintiff.

Charles W. Brannon, Jr., Savannah, Ga., for defendants.

## ORDER

ALAIMO, District Judge.

In this diversity action, plaintiff (franchisor) seeks liquidated damages, costs and attorney's fees for defendants' (franchisee) alleged breach of a franchise agreement. The agreement expressly provides for the recovery of liquidated damages as compensation for a premature termination of the contract by the franchisee. Attorney's fees and costs are similarly included in the agreement to cover the expenses incurred in enforcing the terms and conditions of the agreement. Thus, based on this agreement, plaintiff has moved for summary judgment alleging that defendants prematurely terminated the agreement, thereby entitling plaintiff to the above damages. Defendants counter with their own summary judgment motion, alleging that the liquidated damages provision is penal and therefore void. In the alternative, defendants argue that even if the provision is valid, plaintiff, not defendants, prematurely terminated the agreement. Both motions are presently before the Court.

For reasons discussed below, plaintiff's motion will be DENIED in part and GRANTED in part. Defendants' motion will consequently be DENIED.

## FACTS

On November 3, 1983, a franchise agreement ("License Agreement") was entered into by Ramada Inns, Inc. ("Ramada Inns"), and Motor Inn Investment Corporation ("Motor Inn"). Plaintiff[1] is the successor-in-interest to Ramada Inns and successor to any and all claims under the License Agreement involved in this action. Motor Inn, a defendant in this action, has been merged completely into Lewis Broadcasting Corporation ("Lewis Broadcasting"), which retains all rights of Motor Inn including its rights under the above License Agreement. J. Lewis, Jr., is the President of Lewis Broadcasting and, with respect to the License Agreement, signed a personal guaranty to insure that the obligations of Motor Inn under the Agreement would be met.[2]

The License Agreement in question governs a specific Ramada Inn located at 201 West Oglethorpe Avenue in Savannah, Georgia. Although the property itself belonged to the defendants and was previously operated as a motel, the License Agreement allowed defendants to operate the motel as a Ramada Inns franchise. The term of the agreement was for a period of fifteen (15) years, during which defendant agreed to pay a monthly franchise fee that amounted to 7.5% of gross room sales. *See*

---

**1.** Defendants make a bare allegation that plaintiff is not the party entitled to bring suit. After full consideration of the record, the Court finds that the evidence does show plaintiff as the proper party.

**2.** Motor Inn, Lewis Broadcasting and J. Lewis, Jr. will be noted collectively herein as "defendants."

Section 6 [Fees] of License Agreement. The breakdown was essentially as follows: three (3.0%) percent of the gross room sales accounted for royalty fees to be paid directly to plaintiff; the remaining four and a half (4.5%) percent of the gross room sales accounted for marketing assessments and reservation system assessments, which were to be performed by Ramada International Association ("RINA"). Those payments, however, were also made to plaintiff, who maintained them in a separate account on behalf of RINA.

This action basically revolves around a default provision in the License Agreement. That provision lists a number of events which can constitute a default on behalf of the franchisee under the Agreement, thereby providing cause for termination of the franchise. When one of the enumerated events occurs, and the franchise is thereby terminated, the Agreement further provides for the payment of liquidated damages as compensation to the plaintiff, as franchisor. Costs and attorney's fees incurred by plaintiff in its attempts to enforce the Agreement are similarly provided.

The event which allegedly caused the termination of the agreement by plaintiff here was defendants' failure to continue operating the premises under the contract as a hotel. Specifically, the Agreement provides:

15. Default. Any of the following events will constitute a default and be good cause for Ramada to terminate the License without prejudice to any other rights or remedies which Ramada may have and exercise: ...

(b) Licensee ceases to operate the Hotel, defaults under any lease or sublease of the Hotel, or loses possession or the right to possession of all or a significant part of the Hotel, provided that if the loss of possession is due to governmental exercise of eminent domain, or if the Hotel is damaged or destroyed by fire or other casualty; then the provisions of Section 16 [Loss of the Hotel by Condemnation or Casualty] shall apply.

If the License is terminated pursuant to ... (b) ..., Licensee will immediately pay Ramada (as liquidated damages for premature termination and not as a penalty or as damages for any breach of the Agreement or as a substitute for other payments due to Ramada) an amount equal to the greater of (x) $50,000 or (y) the sum of all monthly payments required under Section 6 [Fees] during the 24 months preceding termination (or such shorter number of months between the date of termination and the date of expiration of the term of the License).

Licensee will pay all costs, expenses and reasonable attorneys fees incurred by Ramada in enforcing the terms and conditions of this Agreement.

The facts surrounding defendants' alleged premature termination of the Agreement are largely undisputed.

Apparently, in early July 1989, Wistar Lewis, son of J. Lewis, Jr., and a vice-president of Lewis Broadcasting, called Mr. Apostle, who was at that time a vice-president of plaintiff, to inform him of defendants' intent to sell the hotel property to the Savannah College of Art and Design ("College"). Rather than continue the use of the property as a hotel, the College intended to convert it into a college dormitory. He explained that the reason for the sale of the property was the lack of profitability that the hotel had been suffering over the past number of years. Mr. Apostle told Wistar that he was sorry for the turn of events and that Wistar needed to follow up the conversation with a written declaration. Mr. Apostle also claims that he informed Wistar that defendants would be held liable for the liquidated damages as specified in the Agreement. Wistar denies that he was so informed. Both parties agree, however, that they did discuss the possibility of defendants continuing the franchise at another location. The possibility of such an occurrence was determined to be unrealistic.

On July 11, 1989, defendants entered into a sales contract with the College in contemplation of the sale of the real estate. Several contingencies were made a part of that contract. The two of primary importance to this case are:

9. Contingencies. This contract and the transactions contemplated hereby shall be contingent upon and subject to the following matters being resolved within 30 days of the date hereof:

> (b) Seller obtaining within such time as allowed in its franchise agreement a written waiver from Ramada, Inc., or other suitable indication of its having waived any rights it may have as franchisor to purchase the Premises.

> \* \* \* \* \* \*

> (d) Seller being able to cancel its Ramada Inn franchise agreement without penalty, prior to the date possession is to be delivered to Purchaser.

Defendants acknowledge that, given the various contingencies in the sales agreement, it was unlikely that they would all have been satisfied within the 30–day period. In fact, a number of them were not satisfied within the specified time period.

On July 12, 1989, defendants followed up the conversation between Wistar and Mr. Apostle with a letter[3] notifying Mr. Apostle, as plaintiff's representative, of defendants' intent to sell the hotel property pursuant to paragraph 13 of the License Agreement.[4] Defendants enclosed the sales agreement for plaintiff's perusal and stated that the offer had been accepted, subject to plaintiff's first right of refusal. Mention was also made of the enclosure of a lease agreement, but no such agreement was attached.[5]

The letter continued with the request that, if plaintiff chose to decline its first-right-of-refusal, defendants would be so informed at the earliest possible date because the College desired to take possession of the property on a lease basis by early September 1989, which would necessitate the termination of the existing hotel operations shortly before that date.

Defendants also requested a written statement from Ramada consenting to the cessation of the hotel operations and acknowledging that this action on behalf of defendants would not be construed as a default under the License Agreement. Commenting that it was possible that one or more of the contingencies in the sales agreement would prevent the consummation of the transaction, defendants left open the question of whether plaintiff would allow the present franchise relationship to continue unabated. In addition, defendants discussed the reasons behind the sale as due to the lack of profitability in recent years. They expressed the hope that, if the sale is consummated, their franchise relationship could eventually continue at another location.

This letter met with an undated written response by Mr. Apostle. He informed defendants that his letter was to serve as plaintiff's waiver of its right-of-first-refusal on the proposed purchase of the subject hotel. He reiterated that plaintiff had already officially negated Paragraph 13 of

---

**3.** This letter was written by J. Lewis, III, another son of J. Lewis, Jr. In addition to being an attorney, J. Lewis, III, is the secretary and another vice-president of Lewis Broadcasting.

**4.** Paragraph 13 of the License Agreement provides:

> 13. Transfer of the Hotel. The transfer of the Hotel (by sale, lease, sublease or otherwise) or any part thereof, or any business conducted therein by Licensee is subject to a right of first refusal by Ramada. Licensee will deliver to Ramada a copy of any *bona fide* offer or contract to purchase which is acceptable to Licensee. Concurrently therewith, Licensee shall also deliver to Ramada (a) copies of all financial information and operating data exhibited to the prospective transferee, and (b) such other financial information and operating data as Ramada may reasonably request. Ramada may, within for-

ty-five (45) days after delivery of the above documentation, purchase or otherwise acquire the property to be transferred, upon the same terms and conditions, otherwise Licensee may transfer the same to the prospective transferee.

Construing this paragraph in conjunction with the whole agreement, it seems that this clause contemplates the sale of the property to one who would continue operating the franchise. This interpretation is further evidenced by defendants' comments in its letter. Defendants enclosed a copy of the sales agreement between itself and the College, but did not enclose any financial or operating data because the premises were to be converted into a dormitory.

**5.** There was also a postscript regarding the alleged lease. In it, defendants informed plaintiff that the lease had not yet been signed but would be sent after execution.

the License Agreement in 1985 through a Letter Agreement sent to all Ramada Licensees. At the close of his letter, Mr. Apostle referred defendants to Bonnie Stevens, who was at that time the manager for the Eastern Division of Franchise Administration, for response to any of defendants' questions.

Thereafter, on July 31, 1989, Bonnie Stevens wrote a letter to defendants. In the letter, she stated that Ramada was informed that defendants were going to cease to operate the franchise on August 28, 1989. She confirmed that such an action constituted premature termination of the License Agreement. She then advised defendants that, under Section 15 of the License Agreement, their premature termination of the Agreement would cause them to be liable to Ramada for liquidated damages in the amount equal to the greater of $50,000 or the sum of all monthly payments required under Section 6 [Fees] during the 24 months preceding termination. In closing, she told defendants that any questions or requests for assistance could be made by notifying her office.

Plaintiff continued under this assumption until August 4, 1989. On that date, Bonnie Stevens was allegedly called by an employee of defendants, Delores Orr, who informed Bonnie Stevens that she was directed by the general manager of Lewis Broadcasting to tell plaintiff that the sale was closed on July 31, 1989. Bonnie Stevens made a memo to her file regarding the telephone conversation with Delores Orr. In the memo, she stated: "I spoke with Delores Orr today, who was instructed by the General Manager to inform Ramada that the close of sale took place July 28, 1989. The facility will be utilized as a dormitory beginning August 19, 1989. I requested that the principals of the Licensee forward a letter in writing verifying the sale." The memo was dated the same day as the alleged phone call—August 4, 1989.

There is no evidence of any later verification in writing by defendants. Although defendants do not admit that this conversation between Delores Orr and Bonnie Stevens took place, neither do they deny it. The only mention of the conversation with

Delores Orr in the depositions accompanying the motions for summary judgment is in Bonnie Stevens' deposition where she states that the conversation took place. However, defendants were not questioned concerning the alleged conversation. The only other references to Delores Orr at all were questions about whether the individuals J. Lewis, Jr., and his sons knew who she was. Their responses were that the name sounded familiar.

Then, on August 9, 1989, Bonnie Stevens sent a "Notice of Final Termination" to defendants via certified mail. She stated that the letter constituted plaintiff's official notice of its determination to terminate and cancel the License Agreement. She specified that the termination resulted from defendants' failure to continuously operate the premises as required by Section 15 of the Agreement. The termination was noted as effective at the close of business July 31, 1989.

The letter included a demand for payment in full of all amounts due under the terms of the License Agreement. It additionally reiterated that pursuant to Section 15 of the Agreement, defendants owed Ramada a specified amount ($249,549) as liquidated damages for the premature termination of the contract. As a final matter, Bonnie Stevens informed defendants that the appropriate action necessary to disassociate defendants from the Ramada System were being taken. Those actions included removal of defendants from the Ramada Directory listing, suspension of Ramada Reservation services and notification of all credit card companies. Defendants were ordered to immediately remove all identification of defendants as a "Ramada Inn."

In closing, Bonnie Stevens proposed that defendants should contact her office if they had any questions or needed assistance with the termination.

This letter was then dispatched to and received by defendants. Unbeknownst to Bonnie Stevens, defendants did not cease to operate the premises as a hotel on July 31, 1989. In fact, it was still being operated as a Ramada Inn at the time defendants received the letter. Because of this incon-

sistency, defendants contend that they interpreted the "Notice of Final Termination" as plaintiff's willingness to allow the cessation of the premises as a hotel without liability on their part. This claim is made notwithstanding the clause in the letter referring to liquidated damages and the indication that plaintiff believed defendants had already ceased operations. Moreover, there is no evidence that defendants immediately attempted to contact plaintiff to discuss the mistake in the letter regarding the actual final operating date.

Based on her letter noticing defendants of plaintiff's decision to terminate the License Agreement due to defendants' actions, Bonnie Stevens immediately set into motion the chain of events that would ultimately lead to the deletion of defendants as a Ramada Inns franchisee. On August 9, 1989, she sent a memo to Mike Gallagher, who was in charge of the various accounts held by the franchisees. In that memo she authorized Gallagher to stop the monthly billing of defendants' franchise due to its termination, effective July 31, 1989. On the same day she distributed a memo to everyone concerned in the franchise administration that "PTU" action was to be taken regarding defendants' franchise. Specifically, she requested that the reservation system be turned off and the computer equipment removed, the sales service be suspended and the franchise be removed from the directory. A notation was made that these services were requested on August 10, 1989, but a further notation remarked that the "property will close as a Ramada 8/19/89" to be converted into a school dormitory, and so the "PTU must be removed prior to this date."

On August 11, 1989, Bonnie Stevens sent another memo (a "system bulletin") which simply informed all interested parties that defendants were deleted as franchisees effective July 31, 1989. A final "system bulletin" sent on that date noted that a number of further actions needed to be taken, including notifying the credit card companies and directory information, as well as visiting the franchise premises.

From the cross-letters, it appears that the parties did not again communicate with each other until August 21, 1989,[6] when one of defendants' representatives—either Wistar Lewis or J. Lewis, III—telephoned Bonnie Stevens to inform her that the hotel closed on that date rather than July 31, 1989. J. Lewis, III, apparently followed up the conversation with a letter which he sent to Bonnie Stevens on the same date—August 21, 1989. In the letter, he acknowledged that defendants were in receipt of Stevens' letters of July 31 and August 9. He further stated that the hotel closed that day (August 21, 1989) in contemplation of the pending sale of the property and that efforts were being made to remove the Ramada signs and logos from the property as soon as practicable. With respect to the other matters raised in Stevens' correspondence, he suggested that they discuss them directly with each other or with plaintiff's representative in Savannah. He closed with the hope that they would be able to also discuss the alternatives for defendants continuing their association with plaintiff.

Bonnie Stevens received that letter on August 23, 1989. On the same day, she dispatched a letter to J. Lewis, III, stating that it was written to correct the termination date of the License Agreement. The correct date was noted as August 20, 1989, which refers to the termination as effective on the close of business that day. The only other correction she made was with regard to the monthly fees due plaintiff. Since she had previously told Mike Gallagher to stop billing defendants, plaintiff's Statement of Account only reflected fees due through July 31, 1989. Therefore, she told defendants to include amounts due through August 20, 1989, in the demand for payment. She then reiterated that the remainder of the items in the August 9,

---

**6.** It is unclear whether the parties did not actually communicate until this date, since no one can remember when things were discussed, nor to whom they spoke. Thus, it is possible that there were more communications regarding this dispute than are noted under the facts here.

Nevertheless, it appears that at least one phone call was made between the parties on August 21, 1989, because Bonnie Stevens made reference to the discussion in a letter she wrote August 23, 1989.

1989, letter were correct with respect to the liquidated damages owed and the termination procedure.

After dispatching that letter, Bonnie Stevens then sent a memo to Mike Gallagher correcting the final termination date to August 20, 1989, and authorizing the additional billing for that time period. Another system bulletin was dispersed that date to correct the proper date for deletion of defendants as franchisees. However, this was a "ghost" bulletin and was not received by all concerned parties. Based on this apparent lack of full curative effect, it would seem that defendants were already fully disassociated from Ramada Inns. Such was not the case. Despite all of the previous communications made in an effort to disassociate defendants from the Ramada name, there is evidence that the reservations system was still in effect and the signs and logos still in place at least until the close of business on August 20, 1989.

The questions before the Court are, therefore, both legal and factual. Plaintiff moved for summary judgment contending that, as a matter of law, defendants breached the License Agreement through their premature termination of the Agreement caused by their failure to operate the property continuously as a hotel. As such, plaintiff demands entry of a judgment against defendants and an award of liquidated damages, costs and reasonable attorney's fees, as provided under the License Agreement.

Defendants respond to plaintiff's contentions asserting, first, that the liquidated damages provision is penal and therefore invalid. Then, assuming that the provision is held valid, defendants assert that it was plaintiff who breached the License Agreement through its August 9, 1989, "Notice of Final Termination." The argument is that plaintiff terminated the franchise under the auspice that defendants ceased to operate it as a hotel when in fact it was still in operation as a hotel at the time of the termination. Because plaintiff was the one who first breached the agreement, defendants contend that they are entitled to summary judgment in their favor. Finally, assuming that the liquidation provision is valid and plaintiff was not the first to breach the License Agreement, defendants contend that there is an issue of fact as to the reasonableness of plaintiff's decision to terminate the Agreement.[7]

## DISCUSSION

Initially, the Court finds that this dispute is governed by both Arizona and Georgia law. The License Agreement under consideration here stipulates that the Agreement was negotiated and executed in Phoenix, Arizona, and that it shall be governed by Arizona law. *See* Paragraph 19 [Miscellaneous Provisions] of License Agreement. Because this Court sits in Georgia, it must first look to Georgia conflicts law to determine whether the contract provision should be given effect. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

With regard to contract actions, the Georgia conflicts rule states that the law of the state where the contract is made and performed governs the validity and interpretation of the contract, except where the parties have chosen the law of a particular state to govern their contractual rights and responsibilities. Where that occurs, the choice of law provision in the contract will govern unless the chosen state has no substantial relationship to the parties or the transaction, or the result obtained from the application of the law of the chosen state would be contrary to Georgia public policy. *Ryder Truck Lines, Inc. v. Goren Equipment Co., Inc.*, 576 F.Supp. 1348 (N.D.Ga. 1983).

 With respect to the issues concerning the breach of the contract, it is evident that Arizona law applies. The agreement provides for the application of Arizona law and the State of Arizona has a substantial

7. The License Agreement provides that the plaintiff will not unreasonably withhold approvals and consents. However, there is no evidence that defendants sought the consent or approval of the sale of the property to the College beyond the plaintiff's alleged first-right-of-refusal. Even if this allegation did present a jury question, the question of who breached the contract is by itself a jury question, as will be discussed later. Thus, the allegation of consent will not be addressed at this time.

interest in the dispute, since the contract was entered into there and plaintiff previously had its principal place of business there. Thus, the use of Arizona law will not be prejudicial to the citizens of Georgia. *See Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, 735 F.Supp. 1545 (M.D.Ga.1988). Moreover, the issue of whether a party breaches a contract by failing to meet a term of the contract is not unusual enough to warrant it being a matter of important public policy. Such issues are usually constrained to contracts involving illegal or immoral purposes. *See Porubiansky v. Emory Univ.*, 156 Ga.App. 602, 275 S.E.2d 163, *aff'd*, 248 Ga. 391, 282 S.E.2d 903 (1981).

■ However, damages provisions in contracts which purport to be liquidated damages, but which are instead penalties intended to deter persons from breaching their contracts, are considered to be contrary to the fundamental public policy of the State of Georgia. Therefore, because the enforceability of the liquidated damages provision involves matters of public policy in Georgia, the Court is constrained to apply Georgia law in resolving whether the damages provision is valid, notwithstanding the parties' choice of Arizona law in their agreement. *Ryder Truck Lines*, 576 F.Supp. at 1354. The issues involving attorney fees and costs will nonetheless be governed by Arizona law, since those issues are not considered to be matters of important public policy under Georgia law. *Id.* at 1354.

## I. *The Liquidated Damages Provision*

The application of Georgia law to the damages provision in this case is really a distinction without a difference. Both Arizona and Georgia apply relatively the same basic concepts to their determination of the enforceability of liquidated damages provisions. The only real difference is the method by which each state has developed its

principles. Georgia derives its concepts from both statutory and case law, *see, e.g.*, O.C.G.A. § 13–6–7, whereas Arizona's law is focused solely on case-by-case evaluations. *See Larson–Hegstrom & Assoc. v. Jeffries*, 145 Ariz. 329, 701 P.2d 587 (1985); *Aztec Film Productions, Inc. v. Quinn*, 116 Ariz. 468, 569 P.2d 1366 (1977).[8]

Through O.C.G.A. § 13–6–7, Georgia law provides that contracts for liquidated damages can be held to be valid and enforceable. Specifically, the statute provides:

> If the parties agree in their contract what the damages for a breach shall be, they are said to be liquidated and, unless the agreement violates some principle of law, the parties are bound thereby.

O.C.G.A. § 13–6–7.

As a result of this statutory language, the Georgia courts have required that, in order for a liquidated damages clause to comply with § 13–6–7, three conditions must be met: (1) the injury caused by the breach must be difficult or impossible of accurate estimation; (2) the parties must intend to provide for damages rather than a penalty; and (3) the sum stipulated must be a reasonable pre-estimate of the probable loss. *Wehunt v. ITT Bus. Communications Corp.*, 183 Ga.App. 560, 359 S.E.2d 383 (1987); *Southeastern Land Fund, Inc. v. Real Estate World, Inc.*, 237 Ga. 227, 227 S.E.2d 340 (1976); *Gibson v. Sheriff*, 155 Ga.App. 578, 271 S.E.2d 710 (1980); *see also Larson–Hegstrom*, 145 Ariz. at 333, 701 P.2d at 591 (an agreement made in advance of a breach is a penalty unless the amount fixed in the contract is a reasonable forecast of just compensation for the harm caused by the breach and the harm caused by the breach is incapable or very difficult of accurate estimation).

■ Looking at each condition in turn, it is evident that the liquidated damages provision in the License Agreement is valid and enforceable. First, the harm caused

---

**8.** As a general rule under Arizona law, in a case involving the breach of a contract, the court will first look to the contract to see what remedies, if any, are available to the nonbreaching party. Then, when the contract is found to provide for the remedy or the amount of damages in the event of a breach, the terms of the contract control. *Green v. Snodgrass,* 79 Ariz. 319, 289

P.2d 191 (1955); *Deuel v. McCollum,* 1 Ariz.App. 188, 400 P.2d 859 (1965). This general rule is, however, qualified by the proviso that the stipulated amount of damages be reasonable. *Marshall v. Patzman,* 81 Ariz. 367, 306 P.2d 287 (1957); *Davis v. Tucson Arizona Boys Choir Soc.,* 137 Ariz. 228, 669 P.2d 1005 (1983).

by a breach in this case is of a kind that is difficult or impossible to estimate accurately. The provision can come into play, as it did here, due to the premature termination of the License Agreement. In such a case, the resulting harm would be the profits lost while the franchisor was without a franchisee.

Generally, the profitability of the franchisor depends on that of the franchisee, since the monthly franchise fees depend on a percentage of gross room sales. Factoring into the amount of rooms sold are the future business ability of the franchisee, changes in the formation of highways and occurrence of traffic, gas and oil shortages, and the general ability of the public at large to use the facilities. All of these represent inexactitudes that eventually contribute either to the success or the demise of the franchise. Both parties agree that running a franchise is a gamble. Even J. Lewis, Jr., admitted in his deposition that at the time they entered the franchise neither defendants nor plaintiff could forecast what the profits might be.

The second condition is similarly met. The intent of the parties can be determined from the language of the contract construed as a whole, in addition to the language in the liquidated damages clause and the special circumstances of the case. Although the specific words "liquidated damages" are not required for a court to find the provision enforceable, there must be some clear manifestation of the parties' intent to agree to liquidated damages. *ADP–Financial Computer Services, Inc. v. First Nat'l. Bank*, 703 F.2d 1261 (11th Cir.1983). The opposite contention would seem to be just as applicable. Therefore, the use of the specific words "liquidated damages" as those recoverable under the License Agreement will not, by themselves, constitute the requisite intent. *See, e.g.,*

*Aztec Film Productions*, 116 Ariz. 470, 569 P.2d at 1368 (the name given to the clause by the parties is not conclusive; the controlling elements are the intention of the parties and the circumstances of the case).

Looking at the circumstances of this case, it is apparent that the parties intended to provide for damages and not a penalty. Both parties recognize that in franchise agreements liquidated damages provisions are commonplace. Mr. Apostle stated in his affidavit and deposition that the provision in this contract was standard and similar to the ones provided in other Ramada franchise agreements. J. Lewis, Jr., further admitted that in his experience with the hotel business, which is far-reaching, he has found liquidated damages provisions to be in the average franchise agreement. According to him, they are simply a standard part of the contract which a person must just accept if he desires to operate a franchise.

Moreover, the language of the agreement evidences an intent on behalf of the parties to provide for liquidated damages, rather than a penalty. Although the words used in the provision are "by no means conclusive, they are a critical factor in determining the intent of the parties." *Alexander v. Steining*, 197 Ga.App. 328, 398 S.E.2d 390 (1990). The damages provision here expressly states that, if the License is terminated for any one of a number of listed reasons, the franchisee must pay plaintiff "as liquidated damages for premature termination and not as a penalty or as damages for any breach of the Agreement or as a substitute for other payments due to Ramada." This language clearly demonstrates an intent to select from the available remedies that would be due to plaintiff in the event of a breach and provide solely for liquidated damages to the exclusion of all others.[9]

9. Defendants argue that the additional language regarding "damages for any breach of the Agreement or as a substitute for other payments due" necessarily implies that plaintiff was attempting to provide for both liquidated as well as actual damages. The agreement, however, is more effectively read as providing for the award of liquidated damages to the exclusion of all others.

Yet even if the provision were read to provide actual damages as an alternative, an award of actual damages could only be given under certain circumstances, such as when the injuries were due to a breach that did not involve the premature termination of the contract. Such provisions are acceptable under Georgia law. The courts recognize that often only certain breaches will result in damages difficult to estimate while other types of breaches can result in

The third and final condition is also met in this case; that is, the stipulated sum was a reasonable pre-estimate of the probable loss. Given the inability to compute exactly the actual damages in this case, the use of the percentage of gross room sales computed over the *last* two years that the franchise was in existence is a reasonable estimate of the franchisor's losses. As a matter of fact, it is probably the closest to actual damages that the parties can get. The same percentage applied in the liquidated damages provision is that used to determine the monthly franchise fee owed plaintiff—a total of 7.5% of the gross room sales.

Because this type of agreement, as one based primarily on the whimsy of the public, necessarily leads to the conclusion that the gross room sales will most likely never be the same from year to year, the best estimate that can reasonably be accomplished is one based on similar payments made closest in time. Thus, if the sales were high in the two years preceding the termination of the agreement, the damages would similarly be high, which would most likely reflect the course of the sales over the next few years. Naturally, though, if the sales in the preceding two years were low, then as a consequence the recoverable damages will be low.

Moreover, the computation of damages based on two years' worth of franchise revenues, rather than some other sliding or graduated amount, is not arbitrary and unreasonable. Based on his knowledge in the area, Mr. Apostle testified in his deposition and affidavit that two years was shown to be the average time it took the franchisor to replace the terminated franchisee in a particular area. Defendants do not dispute this other than to say that the relative time should be based on the actual time it took to find a replacement. Although such a provision would probably be more readily upheld, *see Davis*, 137 Ariz. at 233, 669 P.2d at 1010; it will not be voided as arbitrary just because it includes a stable time period in which the damages are to be measured. There is no dispute here that two years is the average time it takes to find a replacement; thus, the time is reasonable. Furthermore, the agreement does make an exception for contracts which will expire in less than two years.

Defendants also argue that the choice between the greater of $50,000 and the amount calculated under the percentage of gross room sales renders the provision unreasonable. While it is true that a stipulation for the payment of a fixed, unvarying sum upon the breach of the contract can be construed as a penalty, such is not the case here. *See Alexander v. Steining*, 197 Ga. App. 328, 398 S.E.2d 390 (1990); *see also Miller Cattle Co. v. Mattice*, 38 Ariz. 180, 298 P. 640 (1931). This provision uses $50,-000 as the absolute minimum that can be awarded as liquidated damages, because that is the amount of damages plaintiff would suffer despite the length of the remainder of the contract. This part of the provision was intended to compensate for breaches that occurred when there was less than two years remaining on the contract, a factor which would undoubtedly decrease the amount of damages recoverable.

Of course, if it is shown that the franchisor did not actually suffer any harm as a result of the breach, in that particular case, the liquidated damages provision would be construed as a penalty. Such is not the case here. The conclusion that plaintiff has suffered damages greater than the amount of $50,000 is evidenced by the fact that it has been approximately a year and a half since the termination of the agreement and plaintiff has still been unable to replace the franchisee.

Thus, after considering all of the special circumstances in this case in relation to the contract itself, it is evident that the parties intended to provide for the payment of liquidated damages in the event of a default under the agreement. This conclusion is widely supported by the case law. *See Joyce's Submarine Sandwiches, Inc.*

damages that are easily ascertainable. When varying types of breaches are possible in a single type of contract, it would almost be necessary to provide liquidated damages for only those injuries that are hard to ascertain, which would thereby leave the remainder of the injuries to be ascertained in the usual manner. *See Fortune Bridge Co. v. Department of Transportation*, 242 Ga. 531, 250 S.E.2d 401 (1978).

v. California Public Employees' Retirement System, 195 Ga.App. 748, 395 S.E.2d 257 (1990) (similarly involved liquidated damages in a franchise agreement). Perhaps most on point, though involving an interpretation of Arizona law, is the case of *Ramada Inns, Inc. v. Gadsden Motel Company*, 804 F.2d 1562 (11th Cir.1986).

*Gadsden* involved a determination of the enforceability of a prior liquidated damages clause used by Ramada. The court upheld the validity of a provision which, similar to the one in this case, provided for a choice between the greater of a stipulated amount ($20,000) or a percentage of the royalty payments made under the contract in that case for a period of 12 months multiplied by two (which is in essence two years). Because the provision is so similar to the one here and because the law in Arizona is so similar to the law of Georgia, to hold other than in favor of the enforceability of the provision would, in effect, contravene the laws of both states.

## II. Costs and Attorney's Fees

■ Next the Court addresses whether plaintiff is entitled to costs and attorney's fees incurred in the course of enforcing the terms and conditions of the License Agreement, as provided in that Agreement. Under Arizona law, attorney's fees are generally not allowed unless expressly provided for by statute or contract. When a contract does provide for attorney's fees, as the one here expressly does, the provision is enforced in accordance with the terms of the contract. *First Federal Savings and Loan Assoc. of Phoenix v. Ram*, 135 Ariz. 178, 659 P.2d 1323 (1982); *Kammert Brothers Enterprises, Inc. v. Tanque Verde Plaza Co.*, 102 Ariz. 301, 428 P.2d 678 (1968).

Thus, attorney fees may be allowed in an action for breach of contract when the contract so provides. When enforcing the provision in accordance with the terms of the contract, a court must give the provision a broad, rather than narrow or restrictive view. *Kammert*, 102 Ariz. at 301, 428 P.2d at 678. Giving the provision here a reasonably broad meaning so as to comply with the laws of Arizona, this Court finds that plaintiff will be entitled to costs and rea-

sonable attorney's fees if it is successful in enforcing the terms and conditions of the Agreement in this action.

## III. Who Terminated the Agreement First?

In a breach of contract case under Arizona law, the burden of proof is on the plaintiff to plead and prove the breach. The question of whether a contract has been breached is ordinarily a question for the jury. *Kammert*, 4 Ariz.App. 349, 359–60 (1967), vacated on other grounds, 102 Ariz. 301, 428 P.2d 678 (1968); *Matson v. Bradbury*, 40 Ariz. 140, 10 P.2d 376 (1932); *see also Graphics Products Distributors, Inc. v. MPL Leasing Corp.*, 170 Ga.App. 555, 317 S.E.2d 623 (1984) (it is for the jury to determine, based upon the evidence presented, whether there was a breach of contract and, if so, whether the plaintiff sustained damages as a result thereof). The only time judgment can be rendered as a matter of law is when the undisputed material facts in the case, together with the evidence taken in favor of the non-movant, establish that a judgment in favor of the movant is mandated by the applicable law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Thrasher v. State Farm Fire & Casualty Co.*, 734 F.2d 637 (11th Cir.1984).

Although Arizona law is scarce on the issue, other jurisdictions have held that, even where the facts are undisputed, the issue of breach is essentially one for the jury. *See Turrill v. Life Ins. Co. of North America*, 753 F.2d 1322 (5th Cir.1985) (although interpretation of unambiguous contract raises purely legal questions that the court may resolve as a matter of law, whether the parties had substantially complied with the terms of the contract presents pure question of fact for jury alone); *In re Stevenson Associates, Inc.*, 777 F.2d 415 (8th Cir.1985) (failure of condition to perform contractual duty does not as a matter of law discharge promisor of that duty); *Simplex, Inc. v. Diversified Energy Systems, Inc.*, 847 F.2d 1290 (7th Cir.1988) (whether supplier breached supply contract by failing to meet contract specifications was question for jury in breach of contract action).

■ Applying the above principles, the Court holds that the question of who breached the franchise agreement is a matter best left to the determination of the jury. It is for the jury to determine the materiality of the breach and whether the conduct of the parties constituted a breach. *See Battista v. Lebanon Trotting Ass'n,* 538 F.2d 111 (6th Cir.1976); *Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis,* 723 F.2d 512 (7th Cir.1983).

Despite the notion that this Court could probably leave the question for the jury's determination without finding factual disputes, the evidence of some dispute as to the facts only makes the Court's holding stronger. From the evidence presented in the record, affidavits and depositions, the alleged fact that the initial phone call by Delores Orr was made to plaintiff, thereby relaying the wrong information, seems to be disputed. The evidence in the record is lacking on this issue, and defendants completely ignore it in their arguments. Whether or not this conversation took place is of special importance, because it goes to the plaintiff's intent in terminating the Agreement—plaintiff believed that defendants were the initial terminators. There-

fore, in consideration of this discrepancy in addition to other facts that seem to be questioned in the record, as previously mentioned, the Court will deny summary judgment as to the issue of the breach. However, if at trial it is determined that defendants did breach the agreement, plaintiff will be entitled to liquidated damages, as well as costs and reasonable attorney's fees.

CONCLUSION

Upon consideration of all the evidence before it, the Court concludes that a material issue of fact as to who breached the franchise agreement exists. Therefore, both parties' motions for summary judgment on the issue of breach are DENIED. However, the Court holds as a matter of law that the liquidated damages provision and the attorney's fees provision are valid. Accordingly, plaintiff's summary judgment motion with respect to the validity of these clauses is GRANTED. The Clerk of the Court is directed to enter an appropriate judgment.

SO ORDERED.