366 P.3d 1022

**DOBSON BAY CLUB II DD, LLC, a Delaware limited liability company; Dobson Bay Club III KD, LLC, a Delaware limited liability company; Dobson Bay Club IV KG, LLC, a Delaware limited liability company; and Darby AZ Portfolio, LLC, a Delaware limited liability Company, Plaintiffs/Appellants**

v.

**LA SONRISA DE SIENA, LLC, an Arizona limited liability company, Defendant/Appellee.**

**No. 1 CA–CV 13–0709.**

Court of Appeals of Arizona, Division 1.

Jan. 28, 2016.

---

Lewis Roca Rothgerber LLP, By Brian J. Pollock, Jared L. Sutton, Phoenix, Counsel for Plaintiffs/Appellants.

Schern Richardson Finter Decker, PLC, By Michael A. Schern, Mark A. Hanson, Mesa, Counsel for Defendant/Appellee.

Judge MICHAEL J. BROWN delivered the opinion of the Court, in which Presiding Judge PETER B. SWANN and Judge KENTON D. JONES joined.

## OPINION

BROWN, Judge:

¶ 1 Dobson Bay Club II DD, LLC, et al. ("Dobson Bay") appeals the trial court's entry of partial summary judgment in favor of La Sonrisa De Siena, LLC ("La Sonrisa") on Dobson Bay's claim for declaratory relief concerning the enforceability of a late fee provision in a promissory note. The sole issue before us is whether the court erred in concluding La Sonrisa is entitled to recover a $1.4 million late fee on Dobson Bay's delinquent balloon payment as liquidated damages. For the following reasons, we hold that the late fee constitutes a penalty and is therefore unenforceable.

## BACKGROUND

¶ 2 In 2006, Dobson Bay entered into a loan agreement with Canadian Imperial Bank of Commerce ("Canadian Imperial"). As set forth in the agreement, Canadian Imperial loaned Dobson Bay $28.6 million, with a maturity date of September 8, 2009. The loan funded Dobson Bay's acquisition of four commercial properties located in Mari-

copa County and was secured by a deed of trust, assignment of leases and security agreement. As outlined in Article II of the promissory note, Dobson Bay was permitted to tender interest-only installment payments, with the "entire outstanding principal amount" due on the maturity date. Article IV of the promissory note included a late-fee provision, which stated:

> If any installment payable under this Note (including the final installment due on the Maturity Date) is not received by Lender prior to the calendar day after the same is due (without regard to any applicable cure and/or notice period), Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5%) of such unpaid sum or (b) the maximum amount permitted by applicable law to defray the expenses incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment, and such amount shall be secured by the Loan Documents.

The promissory note also provided that in the event of default, Dobson Bay would pay default interest plus costs of collection including reasonable attorneys' fees. The deed of trust further stated that if a foreclosure proceeding were initiated, Dobson Bay would pay attorneys' fees, trustee's fees, and costs related to the foreclosure.

¶ 3 In 2009, Dobson Bay and Canadian Imperial negotiated an extension of the loan, with a new maturity date of September 8, 2012. During the summer of 2012, Dobson Bay and Canadian Imperial began to negotiate another loan extension, but failed to reach an agreement. On October 22, Canadian Imperial sent Dobson Bay a notice of default. On November 28, Canadian Imperial informed Dobson Bay it had assigned the promissory note and deed of trust to La Sonrisa. La Sonrisa then commenced a foreclosure proceeding by recording a notice of trustee's sale. La Sonrisa provided Dobson

Bay a loan payoff statement reflecting a principal balance due of $27,778,698.07, plus regular interest, default interest, a late fee of $1,392,784.90 (5% of the balloon payment), and legal fees of $9,284. La Sonrisa later requested payment of approximately $60,000 in additional attorneys' fees and $140,000 in trustee's fees.

¶ 4 Dobson Bay subsequently obtained new financing and paid La Sonrisa the outstanding loan balance. Dobson Bay disputed, however, the loan payoff amount, including La Sonrisa's entitlement to the late fee. La Sonrisa therefore declined to release the deed of trust. Litigation followed, with Dobson Bay seeking, among other things, a declaratory judgment that it was entitled to a release of the deed of trust and that La Sonrisa was not entitled to recover the late fee.[1] The parties cross-moved for partial summary judgment regarding enforceability of the late fee. The trial court granted partial summary judgment in favor of La Sonrisa under Arizona Rule of Civil Procedure 54(b), finding that the late fee was enforceable as liquidated damages because it reasonably forecasted the harm caused by default and the harm was otherwise difficult to accurately estimate. Dobson Bay timely appealed.

## DISCUSSION

■ ¶ 5 Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a). We review a superior court's grant of summary judgment de novo. *Link v. Pima Cty.*, 193 Ariz. 336, 340, ¶ 12, 972 P.2d 669, 673 (App.1998). If we reverse a grant of summary judgment, we may direct entry of judgment in favor of a party filing a cross-motion for summary judgment with identical legal issues that can be decided as a matter of law. *See Roosevelt Sav. Bank of City of*

---

1. Relative to the issues that remain pending in the trial court, and consistent with the court's order dated March 5, 2013, Dobson Bay deposited a "disputed amount" of $2,067,762.33 with the court, representing the late fee, default interest, attorneys' fees, six months' contractual interest, and a statutory trustee's fee. Dobson Bay acknowledges it owes attorneys' fees in connection with the default, but contests La Sonrisa's entitlement to the late fee, a portion of the default interest based on a waiver defense, and the trustee's fee.

*N.Y. v. State Farm Fire & Cas. Co.,* 27 Ariz.App. 522, 526, 556 P.2d 823 (1976).

### A. Enforceability of Liquidated Damages Provisions

¶ 6 Dobson Bay contends the $1.4 million late fee is unreasonable as a matter of law. In addition to being "vastly disproportionate" to La Sonrisa's actual damages, Dobson Bay asserts that enforcement of the late fee would create a windfall because La Sonrisa has "already been compensated" for its damages under the separate default interest, attorneys' fees, and trustee's fees provisions of the note and deed of trust. La Sonrisa counters that the late fee should be upheld as an enforceable liquidated damages provision, negotiated as part of an arms-length business transaction. Citing the sole expert opinion presented to the trial court, La Sonrisa also contends the fee is reasonable.

¶ 7 Dobson Bay does not dispute that it breached a material term of the promissory note by failing to timely pay the balance of the loan. Thus, according to Article IV of the note, Dobson Bay was obligated to pay the noteholder "the lesser of (a) five percent (5%) of such unpaid sum or (b) the maximum amount permitted by applicable law to defray the expenses incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment[.]" Because La Sonrisa has made no claim or argument that it is entitled to actual damages under subpart (b) of the late-fee provision, we consider only whether it is entitled to recover 5% of the final balloon payment under Arizona law governing liquidated damages.

■ ¶ 8 The principal reason parties include liquidated damages provisions within contracts is to avoid proof and other calculation issues involved in litigating what a reasonable damage award would be in the event a breach occurs, especially when the amount in controversy is small. *See Roscoe–Gill v. Newman,* 188 Ariz. 483, 485, 937 P.2d 673, 675 (App.1996); *see also Mech. Air Eng'g Co. v. Totem Constr. Co.,* 166 Ariz. 191, 193, 801 P.2d 426, 428 (App.1989) (explaining that

a "liquidated damage clause promotes enterprise by increasing certainty and by decreasing risk-exposure, proof problems, and litigation costs"); Restatement (Second) of Contracts § 356(1) (1981) ("Restatement"). Whether a liquidated damages provision is enforceable depends upon the particular circumstances of each case. *See Pima Sav. and Loan Ass'n v. Rampello,* 168 Ariz. 297, 300, 812 P.2d 1115, 1118 (App.1991).

¶ 9 Arizona courts have generally followed the test described in the Restatement of Contracts to determine whether a contractual provision that establishes an amount of damages in advance is reasonable, and therefore enforceable. As explained in *Larson–Hegstrom & Associates v. Jeffries,* an agreement setting the amount of damages in advance of a breach is an unenforceable penalty unless (1) the amount fixed is a reasonable forecast of just compensation for harm caused by the breach, and (2) the harm caused is "incapable or very difficult of accurate estimation." 145 Ariz. 329, 333, 701 P.2d 587, 591 (App.1985) (citing Restatement (First) of Contracts § 339 (1932)). In 1981, the test was reframed as follows:

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

Restatement § 356(1).[2]

■ ¶ 10 The Restatement's revised framing of the inquiry is consistent with the "compensatory, not punitive" objective of contract remedies. *See* Restatement § 356 cmt. a. A contractual provision "fixing unreasonably large liquidated damages," which clearly exceed compensatory damages, "is unenforceable on grounds of public policy as a penalty." Restatement § 356(1). Thus, the touchstone of a liquidated damages clause is reasonableness. *See Wasserman's Inc. v. Twp. of Middletown,* 137 N.J. 238, 645 A.2d 100, 107 (1994) ("Two of the most au-

2. Section 356, which is based in part on former §§ 339 and 579, was "redrafted" to harmonize it with Uniform Commercial Code § 2–718(1). *See* Restatement § 356, Reporter's Note.

thoritative statements concerning liquidated damages are contained in the Uniform Commercial Code and the Restatement (Second) of Contracts, both of which emphasize reasonableness as the touchstone.").

¶ 11 La Sonrisa argues that the liquidated damages fee at issue should be enforced because two sophisticated parties, both represented by counsel, specifically agreed to the 5% late fee. Refusing to enforce late fees, according to La Sonrisa, would take away the benefits of liquidated damages, infringe on the right to contract, and inject uncertainty into legal proceedings.

¶ 12 "When liquidated damages are specified in a contract, the terms of the contract generally control." *Roscoe–Gill,* 188 Ariz. at 485, 937 P.2d at 675. However, Arizona law plainly provides that a contract provision establishing an "unreasonably large sum of liquidated damages . . . is unenforceable because it is deemed to be a penalty." *Id.* Thus, regardless of the sophistication of the parties, the mere act of agreeing to a liquidated damages clause does not mean the clause is necessarily enforceable as a matter of law. *See* Restatement § 356 cmt. a ("The parties to a contract may effectively provide in advance the damages that are to be payable in the event of breach as long as the provision does not disregard the principle of compensation."). Instead, whether a fixed damages amount is so unreasonable as to constitute a penalty involves the consideration of two factors—(1) the anticipated or actual loss caused by the breach, and (2) the difficulties of proof of loss. *Id.* at cmt. b.

## B. Anticipated or Actual Loss

¶ 13 "[T]he amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss." *Id.* Likewise the inverse is true: "The amount fixed is reasonable to the extent that *it approximates the actual loss that has resulted from the particular breach,* even though it may not approximate the loss that might have been anticipated under other possible breaches." *Id.* (emphasis added). But, if there is no actual loss, or if the actual loss is

both easily quantified and not commensurate with the liquidated damages, then the prescribed fixed damages amount will be deemed a penalty. *See id.*

¶ 14 La Sonrisa presented evidence of the reasonableness of the late fee through the declaration of its financing expert, Mitchel Medigovich, who opined generally that a borrower's failure to timely pay "diminishe[s] if not damage[s]" the economic interests of the lender. To minimize this damage, "a predetermined late fee subsidizes the expense of hiring and training loan counselors assigned to call the borrower, of making a field visit to the borrower or engaging in other activities necessary to get the borrower to pay the debt." Medigovich also explained that other secondary costs may be incurred. For example, a lender may be deprived of the ability to reinvest expected cash payments and may also be placed at "great risk" of defaulting on its own financial obligations when the funding for those obligations is contingent on timely payment from the borrower. Medigovich explained further that the lender may suffer reputational harm from an increase in non-performing loans such that depositors may mistrust the institution and seek to withdraw their deposits. The Federal Reserve Board requires that depository institutions maintain minimum capital reserves, and a borrower's failure to timely pay a substantial balloon payment on a large commercial loan may cause the lender's capital reserves to fall below the regulatory requirements. In consideration of these various risks to the lender, Medigovich ultimately opined that a late fee included as part of a loan is not a penalty, but reimbursement "for expenses and lost opportunities that are impossible to quantify at loan inception[.]"

¶ 15 Distilled, Medigovich's opinion testimony presupposes that a lender sustains a myriad of incalculable harms whenever a borrower defaults, and thus a 5% late-fee is reasonable as a matter of law. But conventional, fixed-interest rate loans do not expose the lender to the uncertain losses that liquidated damages clauses are intended to address, particularly with regard to a delinquent balloon payment. When a lender makes a conventional loan, the parties ne-

gotiate the interest rate, default interest, foreclosure of the collateral, late fees on installment payments, and numerous other conditions and obligations that address what payments will be required to ensure the lender is compensated for any losses associated with a default. Thus, the parties decide upon the "compensatory" damages the lender may recover. Under most circumstances, the imposition of an additional 5% fixed late-fee on a balloon payment as a part of such a loan is strictly punitive in nature.[3]

¶ 16 Equally important, Medigovich's opinion about the reasonableness of the late fee is simply irrelevant to this transaction. It is undisputed that La Sonrisa purchased the promissory note from Canadian Imperial after Dobson Bay had defaulted. Thus, at the time of La Sonrisa's acquisition, no damage was speculative or difficult to calculate. La Sonrisa purchased the known debt repayment obligation of Dobson Bay: a distressed product whose value was, by the time of La Sonrisa's purchase, fixed. As a result, nothing in the record suggests La Sonrisa was exposed to any risks of reputational harm, regulatory noncompliance, the inability to fulfill its own financial obligations, or any of the other possible harms Medigovich referenced that could be caused by a borrower's breach, because by the time La Sonrisa entered the picture, Dobson Bay was already in default and all losses, whether incurred by Canadian Imperial or La Sonrisa, were calculable to a degree of reasonable certainty. Therefore, with respect to both Canadian Imperial and La Sonrisa, we conclude as a matter of law that neither the anticipated nor actual losses reasonably approximate the $1.4 million late fee. *See* Restatement § 356(1) (stating that liquidated damages may be agreed upon "but only at an amount that is reasonable in the

light of the anticipated or actual loss caused by the breach").

¶ 17 Relying on prior decisions from this court, La Sonrisa nonetheless argues that when "parties have agreed in advance to the amount of liquidated damages, no showing of actual damages is required." *See Rampello,* 168 Ariz. at 300, 812 P.2d at 1118; *Mech. Air,* 166 Ariz. at 192, 801 P.2d at 427. Without question, those two cases specifically support the proposition that a party seeking enforcement of a liquidated damages clause does not have to show actual damages were sustained. However, neither case analyzed the liquidated damages provisions under Restatement § 356. And, in *Rampello,* the court specifically noted that "the amount retained upon a contract's breach will be considered a penalty if it is unreasonable," thereby confirming that a liquidated damages clause cannot be evaluated in a vacuum. 168 Ariz. at 300, 812 P.2d at 1118 (citing *Marshall v. Patzman,* 81 Ariz. 367, 306 P.2d 287 (1957)). The circumstances here are substantially different than *Rampello,* 168 Ariz. at 299, 812 P.2d at 1117, which involved the forfeiture of an earnest money deposit, and *Mechanical Air,* 166 Ariz. at 192, 801 P.2d at 427, which involved predetermined damages for construction delays.

¶ 18 Moreover, accepting La Sonrisa's argument would mean a court could never compare anticipated and actual losses, which would be contrary to Restatement § 356's express language, comments, and illustrations, as well as pertinent case law. *See* Restatement § 356 cmt. b ("If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable."); *id.* at illustration 4 (showing that when delay in a project's completion date caused no losses, a promise to pay liquidated damages is unenforceable); *see also, e.g., Marshall,* 81 Ariz.

---

3. Certain contractual arrangements fall within the liquidated damages rubric much better than the instant case because the types of losses that occur in those situations tend to be uncertain and difficult to calculate. *See, e.g., Rampello,* 168 Ariz. at 299, 812 P.2d at 1117 (noting the loss of the opportunity to sell the property, effect of a failed sale on market value, effect of depreciation until the property is sold, and potential hazards of ownership not covered by insurance);

*Mech. Air,* 166 Ariz. at 194, 801 P.2d at 429 (noting the burdens of maintaining personnel at job site to supervise the work and continued administration of the job contracts). We express no opinion on whether parties may negotiate a severe liquidated damages clause for a delinquent balloon payment in an unusual loan transaction in which the parties reasonably anticipate default may threaten the lender's viability.

at 370, 306 P.2d at 290 (holding that liquidated damages were "unconscionable" when there was no showing of losses as a result of breach of contract). Likewise, a blanket prohibition against evaluating actual losses would run counter to the purposes of liquidated damages clauses—to provide compensation when damages are difficult to foresee and calculate and to avoid punishing the defaulting party. *See* Restatement § 356 cmt. a. ("Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy.").[4] Thus, as contemplated by Restatement § 356, when the actual losses are easily quantified, we must consider the extent to which the late fee approximates the actual loss in order to properly evaluate its reasonableness.

## C. Difficulty of Proof of Loss

 ¶ 19 Similar to our analysis of anticipated or actual loss, nothing in the record reflects that La Sonrisa actually incurred any of the "immeasurable" damages referenced by Medigovich. Without addressing its actual losses, La Sonrisa notes that courts in Arizona and other jurisdictions have enforced liquidated damages provisions in similar or even greater amounts than the 5% at issue here. The circumstances in this case, however, are far different from the cases La Sonrisa relies upon. La Sonrisa acquired the note post-default and immediately initiated foreclosure proceedings knowing it would incur readily calculable damages such as attorneys'

fees, trustee's fees, interest, and default interest on the note. Rather than suffering broad institutional losses, which may be difficult to fully ascertain and calculate, La Sonrisa's losses are easily quantified to a degree of near certainty. *See LaSalle Bank Nat. Ass'n v. Shepherd Mall Partners*, 140 P.3d 559, 562, ¶ 15 (Okla.Civ.App.2005) ("[W]hen the actual loss is susceptible of calculation and the liquidated damage clause requires payment of an amount that is plainly disproportionate to the loss, the clause will not be enforced."); *In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. 335, 364, 367 (Bankr.D.N.M. 2010) (concluding that damages incurred through foreclosure proceedings (consisting of interest, attorneys' fees, and minimal administrative costs) were not difficult to calculate on a breach for failure to pay a final balloon payment and, because "there would be little or no more administrative expenses in handling and processing delinquent payments," the 5% late fee provided for in the contract constituted an unenforceable penalty).[5]

## D. Combination of Factors

 ¶ 20 Deciding whether the fixed 5% late fee is a penalty turns upon the combination of the two factors discussed above. "If the difficulty of proof of loss is great, considerable latitude is allowed in the approximation of anticipated or actual harm. If, on the other hand, the difficulty of proof of loss is slight, less latitude is allowed in

**4.** According to *Corbin on Contracts:*

> The probable injury that the parties had reason to foresee is a fact that largely determines the question whether they made a genuine pre-estimate of that injury, but the justice and equity of enforcement depend also upon the amount of injury that has actually occurred.... It is to be observed that hindsight is frequently better than foresight, and that, in passing judgment upon the honesty and genuineness of the pre-estimate made by the parties, the court cannot help but be influenced by its knowledge of subsequent events.

11 Joseph M. Perillo, *Corbin on Contracts* § 58.11, at 457–58 (rev. ed.2005).

**5.** As support for its argument, La Sonrisa also cites *MetLife Capital Financial Corp. v. Washington Avenue Associates*, 159 N.J. 484, 732 A.2d 493, 495–96, 499, 502 (1999), which concluded

that a 5% late fee imposed on 40 delinquent installment payments plus a balloon payment was "a valid measure of liquidated damages." MetLife, the banking entity seeking payment of the late fee, presented evidence of institutional harms, such as a department designed to handle collection and reporting of delinquent payments. *Id.* at 496–97. The New Jersey Supreme Court concluded these factors supported the conclusion that the 5% fee was reasonable as "simply part of the cost of doing business." *Id.* at 502. In addition to the lack of factual similarity, the *MetLife* court focused on the overall reasonableness of the clause, as opposed to the two-pronged Restatement standard we have applied here. *See id.* at 499 (stating " 'reasonableness' emerges as the standard for deciding the validity of stipulated damages clauses").

that approximation." Restatement § 356 cmt. b.

¶ 21 Both factors cut sharply against La Sonrisa. First, La Sonrisa has presented no evidence that the $1.4 million late fee reasonably approximated the anticipated losses that would have resulted from Dobson Bay's failure to make the balloon payment in a timely manner generally, much less the actual losses suffered by La Sonrisa. Second, the difficulty of proving loss is not great. As a result of Dobson Bay's breach, La Sonrisa is entitled to compensation for the losses it incurred, which, according to the promissory note and deed of trust, consist of default interest, attorneys' fees and related costs, and trustee's fees. Dobson Bay has challenged whether, on legal grounds, La Sonrisa is entitled to recover all those losses, but that dispute does not alter that the losses are easy to calculate. Applying the factors set forth in Restatement § 356 to these specific circumstances, enforcement of the late-fee provision would serve only punitive purposes rather than compensatory. Therefore, the trial court erred in entering partial summary in favor of La Sonrisa and denying Dobson Bay's motion for partial summary judgment.

## CONCLUSION

¶ 22 We hold, as a matter of law, that absent unusual circumstances the imposition of a flat 5% late-fee on a balloon payment for a conventional, fixed-interest rate loan is not enforceable as liquidated damages, and that Medigovich's declaration is insufficient to generate a triable issue of fact as to the reasonableness of the 5% late-fee. We therefore vacate the trial court's entry of partial summary judgment in favor of La Sonrisa, and remand for further proceedings, including entry of partial summary judgment in favor of Dobson Bay on its claim for declaratory relief on liquidated damages. Both parties request awards of attorneys' fees pursuant to Arizona Revised Statutes section 12–341.01. In our discretion, we award reasonable attorneys' fees and costs on appeal to Dobson Bay subject to its com-

pliance with Arizona Rule of Civil Appellate Procedure 21(c).