IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

DOBSON BAY CLUB II DD, LLC, A DELAWARE LIMITED LIABILITY COMPANY;
DOBSON BAY CLUB III KD, LLC, A DELAWARE LIMITED LIABILITY COMPANY;
DOBSON BAY CLUB IV KG, LLC, A DELAWARE LIMITED LIABILITY COMPANY;
AND DARBY AZ PORTFOLIO, LLC, A DELAWARE LIMITED LIABILITY
COMPANY,
*Plaintiffs/Appellants,*

*v.*

LA SONRISA DE SIENA, LLC, AN ARIZONA LIMITED LIABILITY COMPANY,
*Defendant/Appellee.*

No. CV-16-0029-PR
Filed April 25, 2017

Appeal from the Superior Court in Maricopa County
The Honorable John Christian Rea, Judge
No. CV2013-000989
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division One
239 Ariz. 132, 366 P.3d 1022 (App. 2016)
**VACATED**

COUNSEL:

Brian J. Pollock (argued), Jared L. Sutton, Lewis Roca Rothgerber Christie
LLP, Phoenix, Attorneys for Dobson Bay Club II DD, LLC, et al.

Michael A. Schern, Mark A. Hanson, Schern Richardson Finter Decker PLC,
Mesa; and Stephen C. Biggs (argued), Smith LC, Phoenix, Attorneys for La
Sonrisa de Siena, LLC

D. Jeffrey Craven, The Craven Firm PLLC, Phoenix, Attorneys for Amicus
Curiae Arizona Private Lender Association

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICE BRUTINEL joined. JUSTICE BOLICK dissented.

JUSTICE TIMMER, opinion of the Court:

¶1 A liquidated damages contract provision is enforceable if the pre-determined amount for damages seeks to compensate the non-breaching party rather than penalize the breaching party. We here hold that a nearly $1.4 million late fee assessed on a final loan balloon payment constitutes an unenforceable penalty.

## I. Background

¶2 In 2006, Canadian Imperial Bank of Commerce loaned Dobson Bay Club II DD, LLC and related entities ("Dobson Bay") $28.6 million for Dobson Bay's purchase of four commercial properties. The loan was secured by a deed of trust encumbering those properties. Under the terms of a promissory note, Dobson Bay was to tender interest-only payments to Canadian Imperial Bank until the loan matured in September 2009, when the entire principal would become due—the "balloon" payment. In 2009, the parties extended the loan maturity date to September 2012.

¶3 Dobson Bay bore significant consequences for any delay in payment. In addition to continuing to pay regular interest, Dobson Bay was required to pay default interest and collection costs, including reasonable attorney fees, and a 5% late fee assessed on the payment amount. If Canadian Imperial Bank foreclosed the deed of trust, Dobson Bay was also obligated to pay costs, trustee's fees, and reasonable attorney fees.

¶4 As the 2012 loan maturity date approached, the parties negotiated to extend that date but could not reach an agreement. The maturity date passed, and Dobson Bay failed to make the balloon payment.

¶5 La Sonrisa de Siena, LLC ("La Sonrisa") bought the note and deed of trust from Canadian Imperial Bank and promptly noticed a trustee's sale of the secured properties. It contended that Dobson Bay owed more than $30 million, including a nearly $1.4 million late fee. Dobson Bay

disputed it owed various sums, including the late fee. Litigation ensued. Dobson Bay secured new financing and paid the outstanding principal and undisputed interest in March 2013. (Dobson Bay simultaneously deposited the disputed amounts with the superior court pending the litigation.) The parties filed cross-motions for partial summary judgment on whether the late fee provision in the note was an enforceable liquidated damages provision or, instead, an unenforceable penalty.

¶6 The superior court granted partial summary judgment for La Sonrisa, ruling that the late fee was enforceable as liquidated damages. The court of appeals reversed, holding "as a matter of law, that absent unusual circumstances the imposition of a flat 5% late-fee on a balloon payment for a conventional, fixed-interest rate loan is not enforceable as liquidated damages." *Dobson Bay Club II DD, LLC v. La Sonrisa de Siena, LLC*, 239 Ariz. 132, 140 ¶ 22, 366 P.3d 1022, 1030 (App. 2016).

¶7 We granted review because the enforceability of late fee provisions in commercial loan agreements presents a legal issue of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II. Discussion

### A. Enforceability of liquidated damages provisions

¶8 Parties to a contract can agree in advance to the amount of damages for any breach. *See Miller Cattle Co. v. Mattice*, 38 Ariz. 180, 190, 298 P. 640, 643 (1931). Such "liquidated damages" provisions serve valuable purposes. They provide certainty when actual damages would be difficult to calculate, and they alleviate the need for potentially expensive litigation. *Cf. Mech. Air Eng'g Co. v. Totem Constr. Co.*, 166 Ariz. 191, 193, 801 P.2d 426, 428 (App. 1989) (noting that a liquidated damages provision "promotes enterprise by increasing certainty and by decreasing risk-exposure, proof problems, and litigation costs); Restatement (Second) of Contracts ("Restatement Second") § 356 cmt. a. (Am. Law Inst. 1981) ("The enforcement of such provisions . . . saves the time of courts, juries, parties and witnesses and reduces the expense of litigation.").

3

**¶9** Parties, however, do not have free rein in setting liquidated damages. Because "[t]he central objective behind the system of contract remedies is compensatory, not punitive," parties cannot provide a penalty for a breach. Restatement Second § 356 cmt. a; *see also id.* ("Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy."). "A [contract] term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." *Id.* § 356(1). The contract remains valid, however, and the non-breaching party can still recover actual damages. *See Gary Outdoor Advert. Co. v. Sun Lodge, Inc.*, 133 Ariz. 240, 243, 650 P.2d 1222, 1225 (1982); *Miller Cattle*, 38 Ariz. at 190, 298 P. at 643.

**¶10** Arizona courts have used different methods to decide whether stipulated damages provisions are enforceable as liquidated damages or void as penalties. This Court has considered whether the stipulated amounts were reasonably related to actual damages. *See Marshall v. Patzman*, 81 Ariz. 367, 370, 306 P.2d 287, 289 (1957); *Tennent v. Leary*, 81 Ariz. 243, 249, 304 P.2d 384, 388 (1956); *Weatherford v. Adams*, 31 Ariz. 187, 197, 251 P. 453, 456 (1926); *Armstrong v. Irwin*, 26 Ariz. 1, 9, 221 P. 222, 225 (1923). We have also examined liquidated damages provisions prospectively, considering whether they were reasonable at the time the contracts were created. *See Gary Outdoor Advert. Co.*, 133 Ariz. at 242–43, 650 P.2d at 1224–25; *Miller Cattle*, 38 Ariz. at 190, 298 P. at 643.

**¶11** Our court of appeals has generally applied a two-part test developed under the Restatement (First) of Contracts ("Restatement First") (Am. Law Inst. 1928) § 339. Under that test, which our dissenting colleague implicitly relies on, *see infra* ¶ 50, a stipulated damages provision is an unenforceable penalty unless "(1) the amount fixed is a reasonable forecast of just compensation for harm that is caused by the breach, and (2) the harm caused is 'incapable or very difficult of accurate estimation.'" *Dobson Bay Club*, 239 Ariz. at 136 ¶ 9, 366 P.3d at 1026 (citing Restatement First § 339); *see also Pima Sav. & Loan Ass'n v. Rampello*, 168 Ariz. 297, 300, 812 P.2d 1115, 1118 (App. 1991); *Mech. Air Eng'g Co.*, 166 Ariz. at 193, 801 P.2d at 428; *Larson-Hegstrom & Assocs., Inc. v. Jeffries*, 145 Ariz. 329, 333, 701 P.2d 587, 591 (App. 1985).

¶12        In this case, the court of appeals applied Restatement Second § 356(1), which reframed the Restatement First test in 1981 to harmonize with Uniform Commercial Code ("UCC") § 2-718(1). *See Dobson Bay Club*, 239 Ariz. at 136 ¶ 9 n.2, 366 P.3d at 1026 n.2; Restatement Second § 356 reporter's note.   Section 356(1) provides that a liquidated damages provision is enforceable, "but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss."   This test requires courts to consider (1) the anticipated or actual loss caused by the breach, and (2) the difficulty of proof of loss.   Whether a fixed amount is a penalty turns on the relative strengths of these factors.   As explained by comment b to § 356:

> If the difficulty of proof of loss is great, considerable latitude is allowed in the approximation of anticipated or actual harm. If, on the other hand, the difficulty of proof of loss is slight, less latitude is allowed in that approximation. If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable.

¶13        La Sonrisa urges us to disavow the Restatement Second § 356(1) test to the extent it "retrospectively" considers actual damages.   It contends that this approach undermines the contracting parties' freedom to allocate risk and defeats the purpose of a liquidated damages provision by requiring the non-breaching party to establish actual damages.   Not so.

¶14        Section 356(1) provides two methods for deciding whether the parties' damages forecast was reasonable.   The amount is reasonable if it approximates either the loss anticipated at the time of contract creation (despite any actual loss) or the loss that actually resulted (despite what the parties might have anticipated in other circumstances).   *See* Restatement Second § 356 cmt. b.   The non-breaching party is not required to prove actual damages to enforce a liquidated damages provision, and a court will respect the parties' agreement if it is "reasonable" in relation to anticipated or actual loss.   But if the difficulty of proof of loss is slight and either no loss occurs or the stipulated sum is grossly disproportionate to the loss, the parties' stipulation would be unreasonable and therefore unenforceable as

a penalty. *See id.* This approach is consistent with this Court's opinions. *See Marshall*, 81 Ariz. at 370, 306 P.2d at 289 (holding that stipulated damages were "unconscionable under the circumstances" and unenforceable because the non-breaching party suffered no loss); *Weatherford*, 31 Ariz. at 197, 251 P. at 456 ("Where the amount retained is grossly disproportionate to the actual damages . . . and, especially, when there is available a simple method for ascertaining the exact damages, [a stipulated damages provision] will be considered as a penalty.").

**¶15**        We adopt the Restatement Second § 356(1) to test the enforceability of a stipulated damages provision. First, § 356(1) aligns with UCC § 2-718(1), which Arizona has adopted. *See* A.R.S. § 47-2718(A). Thus, courts can apply the same test to both UCC-governed and non-UCC-governed contracts. Second, the test best accommodates the goal of compensating the non-breaching party for a loss rather than penalizing the breaching party. Under the Restatement Second test, courts have flexibility to respect the parties' right to stipulate to damages for a breach but, when appropriate, prevent imposition of a penalty.

### B.  Application of Restatement Second § 356(1) to this case

**¶16**        The late fee provision in the promissory note here provides:

> If any installment payable under this Note (including the final installment due on the Maturity Date) is not received by Lender prior to the calendar day after the same is due . . . Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5%) of such unpaid sum or (b) the maximum amount permitted by applicable law to defray the expenses incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment . . . .

La Sonrisa seeks 5% of the late balloon payment; "the maximum amount permitted by applicable law" is not at issue.

**¶17**         Dobson Bay, as the party seeking to avoid enforcement of the late fee provision, has the burden of persuading this Court that the provision imposes an unenforceable penalty. *Cf. United Behavioral Health v. Maricopa Integrated Health Sys.*, 240 Ariz. 118, 122 ¶ 14, 377 P.3d 315, 319 (2016) (stating that the party claiming that a contractual arbitration provision is preempted by federal law bears the burden of proving it); *Goode v. Powers*, 97 Ariz. 75, 81, 397 P.2d 56, 60 (1964) (noting that a challenger to a contract bears the burden of showing illegality); *Duenas v. Life Care Ctrs. of Am., Inc.*, 236 Ariz. 130, 136 ¶ 14, 336 P.3d 763, 769 (App. 2014) (concluding that party challenging a contract term bears the burden of showing unconscionability); *see also DJ Mfg. Corp. v. United States*, 86 F.3d 1130, 1134 (Fed. Cir. 1996) ("A party challenging a liquidated damages clause bears the burden of proving the clause unenforceable."). To decide the matter, we do not apply any bright-line rules but construe the clause "according to the circumstances of the case, and in the light of all the facts surrounding it." *Miller Cattle*, 38 Ariz. at 190, 298 P. at 643.

**¶18**         We review the grant of partial summary judgment de novo as an issue of law. *See Cramer v. Starr*, 240 Ariz. 4, 7 ¶ 8, 375 P.3d 69, 72 (2016). Whether a contract provides for liquidated damages or a penalty is also an issue of law we review de novo. *See Rampello*, 168 Ariz. at 300, 812 P.2d at 1118.

## 1.  Anticipated or actual damages

**¶19**         Dobson Bay argues that the late fee provision was neither a reasonable forecast of anticipated damages nor reasonably related to actual damages incurred as a result of the untimely balloon payment because La Sonrisa's loss has been compensated already by payment of default interest and collection costs. La Sonrisa asserts that actual damages are irrelevant. It contends that when the loan was made, the 5% late fee was a reasonable forecast of just compensation for harm that could be caused by Dobson Bay's default in timely making the balloon payment.

### a.         Anticipated damages

**¶20**         The late fee did not reasonably forecast anticipated damages likely to result from an untimely balloon payment.

¶21        First, the 5% fee is static, payable on demand whether the payment is one day late or one year late.  Five percent of the loan principal is a significant sum of money, which did not likely reflect losses from a short delay in payment.  Because the fee did not account for the length of time Canadian Imperial Bank would be deprived of the balloon payment, the fee could not reasonably predict the Bank's loss.  *Cf. Miller Cattle*, 38 Ariz. at 190, 298 P. at 643 (stating that a principal rule used to decide whether a contract imposes a penalty or liquidated damages is whether the payment "is a fixed and definite sum, regardless of the nature or extent of the breach of the contract, or whether it is based upon, and varies with, the nature and extent of the breach"); *Grand Union Laundry Co. v. Carney,* 153 P. 5, 7 (Wash. 1915) (cited with approval in *Miller Cattle*, 38 Ariz. at 190, 298 P. at 643) ("[A]nother feature that some times influences courts to construe a provision for liquidated damages into a penalty [is that] of fixing for any one of several different kinds and degrees of breach an equal forfeiture of money.").

¶22        La Sonrisa asserts that the 5% late fee did not necessarily establish a fixed sum of approximately $1.4 million as "[a]t the time the parties formed their agreement, the exact amount of the final installment was unknown because the loan documents provided Dobson Bay with the flexibility to pay all, some, or none of the principal prior to the maturity date."  But the note permits Dobson Bay to prepay the loan principal only "in whole" and "not in part," except that any condemnation or casualty insurance proceeds would be applied to pay down the principal.  Thus, unless Dobson Bay prepaid the entire principal amount, meaning the late fee provision would not apply, the parties contemplated that the balloon payment would approximate the entire loan principal, requiring a late fee of roughly $1.4 million for an untimely payment.

¶23        Second, the late fee either duplicated other fees triggered by a default or was grossly disproportionate to any remaining sums needed to compensate for the anticipated losses identified in the late fee provision.  *Cf. United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, 138 ¶ 16, 128 P.3d 756, 761 (App. 2006) ("The right to recover liquidated damages is limited by the express terms of the parties' agreement."); 11 Joseph M. Perillo, Corbin on Contracts § 58.11 at 457 (rev. ed. 2005) ("The probable injury that the parties had reason to foresee is a fact that largely determines the question whether they made a genuine pre-estimate of that injury . . . .").

8

¶24 The late fee is calculated as the lesser of 5% of the delinquent payment or the maximum amount permitted by law "to defray the expenses incurred by [Canadian Imperial Bank] in handling and processing such delinquent payment and to compensate [Canadian Imperial Bank] for the loss of the use of such delinquent payment." It is debatable whether this quoted language qualifies each calculation method or just the latter one. But it matters not. Requiring an "either-or" comparison to fix the late fee suggests that both calculation methods were intended to compensate for the same categories of loss: (1) the costs in handling and processing a late payment, and (2) the loss of use of the payment. *Cf. Smith v. Melson, Inc.*, 135 Ariz. 119, 121, 659 P.2d 1264, 1266 (1983) ("A contract should be read in light of the parties' intentions as reflected by their language and in view of all the circumstances."); *State ex rel. Goddard v. R.J. Reynolds Tobacco Co.*, 206 Ariz. 117, 122 ¶¶ 23–24, 75 P.3d 1075, 1080 (App. 2003) (stating that words used in a contract must be read in context); *see also In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. 335, 344, 363 (Bankr. D.N.M. 2010) (interpreting almost identical language as stating the purpose for the late fee).

¶25 Both categories of loss identified in the late fee provision are substantially addressed elsewhere in the promissory note and deed of trust. Assuming that "handling and processing" includes actions taken to collect the late payment, those costs would be compensated by Dobson Bay's required payment of "all costs of collection," including reasonable attorney fees, and, in the event of foreclosure, "all expenses incident to such proceeding," including attorney fees and trustee's fees and costs. The loss of use of money would be compensated by continuing payments of regular interest plus default interest. *Cf. Ariz. E. R.R. Co. v. Head*, 26 Ariz. 259, 262, 224 P. 1057, 1058 (1924) ("Interest is the compensation paid for the use of money.").

¶26 What's left to compensate by payment of a $1.4 million late fee? La Sonrisa and the dissent rely on an affidavit from Mitchel Medigovich, a commercial lending expert, who opined that a 5% late fee is a reasonable forecast of just compensation for impairment of a bank's economic interests due to an untimely balloon payment. But much of this anticipated impairment falls outside the two categories of loss identified by the parties in the late fee provision. For example, Medigovich states that a predetermined late fee compensates for post-default "reputational risks," "regulatory risks," and the "risk of expense of preserving the collateral."

Medigovich addresses the categories of loss identified in the late fee provision by stating that late fees properly subsidize a lender's debt collection practices and compensate for the loss of expected funds. He does not explain, however, what amounts, if any, are reasonably needed to compensate for these expected losses when, as here, the borrower is already obligated to pay all collection costs and interest at both the regular rate and a default rate. Consequently, Medigovich's affidavit does not persuade us that a flat $1.4 million late fee was a reasonable forecast of Canadian Imperial Bank's anticipated losses from a late balloon payment that would not have been compensated by the payment of regular interest, default interest, and collection costs.

¶27        This case is distinguishable from *MetLife Capital Financial Corp. v. Washington Avenue Associates L.P.*, 732 A.2d 493 (N.J. 1999), on which La Sonrisa and the dissent rely. There, the court concluded that a 5% late charge assessed against delinquent monthly installment payments of about $14,000 was enforceable as liquidated damages. *Id.* at 495–96, 502. The reasonableness of applying the charge against a final balloon payment was not at issue. *See id.* at 495 ("We now consider whether the five percent late charge assessed against each delinquent payment . . . constitute[s] reasonable stipulated damages provisions."); *see also MetLife Capital Financial Corp. v. Washington Ave. Assoc., L.P.*, 713 A.2d 527, 531 (N.J. App. 1998) (stating that application of the late charge against a final balloon payment of about $69,000 was not at issue), *aff'd in part, rev'd in part*, 732 A.2d 493 (N.J. 1999). Assessing a $700 late fee for an untimely installment payment may well reflect a reasonable assessment of the internal costs of monitoring and collecting late installment payments during the loan tenure. But that is a far cry from assessing a nearly $1.4 million fee for a delayed balloon payment of the loan principal, particularly given that the lender here was otherwise entitled to compensation for its collections costs and loss of use of the funds.

¶28        In sum, a flat 5% late fee did not reasonably predict the damages that would be sustained by Canadian Imperial Bank for a late balloon payment of the entire loan principal.

    b.    **Actual damages**

10

¶29        The $1.4 million late fee did not reasonably approximate either the actual costs of handling and processing the late balloon payment or the loss of use of that payment.

¶30        The summary judgment papers did not address the actual losses incurred by Canadian Imperial Bank and La Sonrisa after Dobson Bay's default.  Nevertheless, the record reflects that neither lender spent significant time handling and processing the late payment.  The only outstanding payment was the last payment, and nothing suggests that either lender had much to "handle and process" before the trustee's sale was initiated.  *Cf. In re Mkt. Ctr. E. Retail Prop., Inc.*, 433 B.R. at 364 (concluding that after default on a balloon payment "there would be little or no more administrative expenses in handling and processing delinquent payments" and "[a]ll that is left to do is have the attorneys sue to foreclose").  The note already required Dobson Bay to pay any collection costs, including attorney fees.  It is inconceivable that any remaining administrative collection costs approached $1.4 million, particularly in light of the short time between the default and initiation of the trustee's sale—about three months.  Thereafter, the deed of trust applied to require Dobson Bay to pay attorney fees and trustee's fees and costs.

¶31        La Sonrisa was also compensated for the loss of use of money suffered by it and its assignor, Canadian Imperial Bank, by Dobson Bay's obligation to pay regular and default interest.  *Cf. K.B. v. State Farm Fire & Cas. Co.*, 189 Ariz. 263, 267, 941 P.2d 1288, 1292 (App. 1997) ("An assignee steps into the shoes of her assignor.").  Dobson Bay was current on the loan until the maturity date.  La Sonrisa did not dispute Dobson Bay's representation at oral argument before this Court that La Sonrisa received between $600,000 and $700,000 in default interest alone for the six-month delay in paying the balloon amount.

¶32        In sum, nothing indicates that either lender, separately or together, suffered an uncompensated loss that approached $1.4 million.

### 2.        Difficulty of proof of loss

¶33        We next consider the difficulty of proving the losses actually sustained by Canadian Imperial Bank and La Sonrisa in handling and processing the late balloon payment and by being deprived of use of that

payment. Restatement Second § 356 cmt. b & illus. 2–4. In doing so, we examine the difficulty of either proving that a loss occurred or establishing its amount with certainty. *Id.* § 356 cmt. b.

¶34 La Sonrisa would have had no difficulty proving it sustained a loss in handling and processing the late balloon payment, if a loss occurred. (Because La Sonrisa noticed the trustee's sale about a week after acquiring the loan, it may not have expended any resources handling and processing the balloon payment.) It could have produced evidence of the tasks undertaken by it to do so. La Sonrisa would have had slightly more difficulty precisely proving the amount of damages incurred from any such loss depending on what activities constituted "handling and processing" and how it allocated the costs of these activities. *Cf. Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 511 P.2d 1197, 1203 (Cal. 1973) (invalidating a late fee provision and noting that "[t]he lender's charges could be fairly measured by the period of time the money was wrongfully withheld plus the administrative costs reasonably related to collecting and accounting for a late payment").

¶35 La Sonrisa would have had no difficulty proving that either lender sustained a loss by being deprived of the use of the balloon payment. Interest on the outstanding amount could have been assessed to compensate for the loss of use of money. *Cf. Ariz. E. R.R. Co.*, 26 Ariz. at 262, 224 P. at 1058. And La Sonrisa would be entitled to collect interest earned when Canadian Imperial Bank was the note payee and the loan was in default. *Cf. K.B.*, 189 Ariz. at 267, 941 P.2d at 1292. Indeed, the promissory note required Dobson Bay to pay regular interest and default interest for that purpose.

¶36 In sum, under the circumstances here, the difficulty of proving La Sonrisa's loss as identified in the late fee provision was slight.

### 3. Consideration of factors

¶37 We are persuaded that the late fee is an unenforceable penalty. The difficulty of proving losses attributable to handling and processing the balloon payment was slight. We therefore give less latitude to Canadian Imperial Bank and Dobson Bay's approximation of anticipated or actual harm. *See* Restatement Second § 356 cmt. b.

¶38 As explained, the late fee neither reasonably forecasted anticipated damages for the losses identified in the late fee provision nor reasonably approximated the actual losses. In view of Dobson Bay's obligation to pay regular and default interest, collection costs, trustee's fees and costs, and attorney fees as a consequence of the six-month delay in paying the balloon, an approximate $1.4 million late fee is unreasonable and an unenforceable penalty. La Sonrisa is not precluded, however, from seeking actual damages incurred for handling and processing the late balloon payment and for losing use of the payment if La Sonrisa has not already been compensated for that loss by the other fees and costs Dobson Bay is required to pay under the note and deed of trust. *See Gary Outdoor Advert. Co.*, 133 Ariz. at 243, 650 P.2d at 1225.

### C. The dissent

¶39 Our dissenting colleague colorfully compares our decision to a child's cry of "backsies" to sidestep a promise. Rather than invoking playground rules, however, we apply long-established common law principles that render contractual penalty provisions—even when agreed upon by sophisticated parties—unenforceable as a matter of public policy. This is nothing unique. Courts will likewise disregard the parties' intent and refuse to enforce contract terms that are unconscionable, illegal, or otherwise against public policy. *Cf. Maxwell v. Fidelity Fin. Servs., Inc.*, 184 Ariz. 82, 88, 907 P.2d 51, 57 (1995) ("[E]ven if the contract provisions are consistent with the reasonable expectations of the party they are unenforceable if they are oppressive or unconscionable." (internal quotations and alterations omitted)); *Goodman v. Newzona Inv. Co.*, 101 Ariz. 470, 474, 421 P.2d 318, 322 (1966) (recognizing "the fundamental right of the individual to [have] complete freedom to contract . . . so long as his contract is not illegal or against public policy"). That the dissent prefers to ignore these principles does not affect their applicability.

¶40 The dissent is also incorrect that our decision runs afoul of the Arizona Constitution's "contract clause," article 2, § 25, an argument La Sonrisa has never made. Our colleague contends that we assign Dobson Bay a burden of persuasion that is so insubstantial it "impair[s] the obligation of contract." *See infra* ¶ 46. But judicial invalidation of a contract provision does not implicate the contract clause. *Cf. Tidal Oil Co. v. Flanagan*, 263 U.S. 444, 451 (1924) (finding no violation of the federal

13

contract clause where a state supreme court declared a contract void and unenforceable because "the obligation of contracts against state action[] is directed only against impairment by legislation and not by judgments of courts"); *Barrows v. Jackson*, 346 U.S. 249, 260 (1953) (citing *Tidal* and holding that a state court's refusal to enforce a racially restrictive covenant did not violate the federal contract clause); *see also Fields v. Elected Officials' Ret. Plan*, 234 Ariz. 214, 218 ¶ 16, 320 P.3d 1160, 1164 (2014) (noting that the Court interprets Arizona's contract clause using an "analysis similar to that employed by the Supreme Court" when interpreting the federal contract clause); *Hall v. Elected Officials' Ret. Plan*, 241 Ariz. 33, 383 P.3d 1107, 1126 ¶ 69 (2016) (Bolick J., dissenting in part and concurring in the judgment in part) (noting, with regard to the state contract clause, that "[h]istorically, Arizona courts have applied the United States Supreme Court's test for determining violations of the Contract Clause of the Federal Constitution").

**¶41** Even if the contract clause had been argued here and applies, it would not change our decision. The contract clause only limits the state's ability to impair existing contract obligations; it does not curtail application of proscriptive principles that existed at the time of contract creation. *Cf. State v. Direct Sellers Ass'n*, 108 Ariz. 165, 169–70, 494 P.2d 361, 365–66 (1972) ("The [contract clause of the federal constitution] means only that no state may impair the obligation of an [e]xisting contract."); *Foltz v. Noon*, 16 Ariz. 410, 417, 146 P. 510, 512 (1915) (noting that a statute will not violate the Arizona Contract Clause "when applied to contracts made subsequent to its taking effect"); *Samaritan Health Sys. v. Superior Court*, 194 Ariz. 284, 293 ¶ 41, 981 P.2d 584, 593 (App. 1998) ("[Arizona's] contract impairment clause only limits the legislature's ability to impair obligations under existing contracts."). Our cases proscribed penalty clauses long before origination of the loan here, and the note incorporated this proscription. *Cf. Bhd. of Am. Yeoman v. Manz*, 23 Ariz. 610, 615, 206 P. 403, 404 (1922) ("It is a familiar rule that the law in force at the time a contract is executed enters into and forms a part of the contract."); *Qwest Corp. v. City of Chandler*, 222 Ariz. 474, 484 ¶ 34, 217 P.3d 424, 434 (App. 2009) ("[A]ll contracts incorporate applicable statutes and common-law principles."). Consequently, our refusal to enforce a penalty provision did not impair the parties' contract obligations here.

### III. Conclusion

**¶42** We vacate the court of appeals' opinion, reverse the trial court's partial summary judgment in favor of La Sonrisa on the liquidated damages claim, and remand to that court for further proceedings, including entry of partial summary judgment for Dobson Bay on its declaratory relief claim concerning the late fee. We award Dobson Bay its reasonable attorney fees pursuant to A.R.S. § 12-341.01 subject to its compliance with ARCAP 21(c).

BOLICK, J., dissenting.

¶43          As children, we learn that the rules of the playground dictate that if someone makes a promise, no matter how solemnly, it is unenforceable if the person making the promise had his fingers crossed behind his back.  As we grow up, we learn instead that many promises are moral and legal obligations, with consequences properly attached to breaking them.  Still, some grown-ups prefer the playground rules.

¶44          The Court today invalidates a core and unambiguous provision of a contract freely negotiated for mutual benefit between sophisticated parties represented by competent counsel.  After Dobson Bay reaped the full benefits of its bargain, it defaulted on its repayment obligation and looked to the courts to avoid significant agreed-upon consequences of that default.  The majority determines that the liquidated damages provision agreed to by the parties is an unenforceable penalty, based on its thorough examination of the Restatement (Second) of Contracts.  Because I believe that over the course of that journey the majority lost the forest for the trees, I respectfully dissent.

¶45          The relevant provision of the Restatement (Second) is consistent with A.R.S. § 47-2718, which provides that a contract term "fixing unreasonably large liquidated damages is void as a penalty."  As with all statutes, we must construe this provision, if at all possible, in a constitutional manner.  *State v. Thompson*, 204 Ariz. 471, 474 ¶ 10, 65 P.3d 420, 423 (2003).

¶46          Freedom of contract allows individuals to order their affairs and exchange goods and services, without coercion, in accord with their personal values and priorities.  The Arizona Constitution so venerates contractual freedom that it is enshrined in our Declaration of Rights.  Article 2, section 25 commands, "No . . . law impairing the obligation of a contract, shall ever be enacted."  That provision requires us to indulge every presumption in favor of upholding a contract negotiated as this one was, and to assign a substantial burden of demonstrating unenforceability to the party challenging the terms to which it willingly and knowingly agreed.  The majority purports to assign the burden of persuasion to Dobson Bay, *see* ¶ 17, but that "burden" is so insubstantial as to transform § 47-2718 into "a law impairing the obligation of a contract."

¶47          "The law of liquidated damages is unique within the common law of contracts because it overtly affronts freedom of contract."  Larry A.

16

Dimatteo, *A Theory of Efficient Penalty: Eliminating the Law of Liquidated Damages*, 38 Am. Bus. L.J. 633, 634 (2001). That is because it allows courts to displace the intent of the parties by determining that a provision amounts to a penalty. Such discretion should be exercised with great care, for as the majority aptly notes, liquidated damages provisions "serve important purposes," such as providing certainty when actual damages would be difficult to calculate and avoiding the costs and delays of litigation. *See* ¶ 8.

**¶48** Moreover, "a party concerned foremost with performance, especially a timely performance, may use such a clause in the hope that it will provide a further inducement for performance." Dimatteo, 38 Am. Bus. L.J. at 634. Certainly that is the case with the contract here. Dobson Bay sought a considerable loan—$28.6 million—to purchase four commercial properties. Under the contract terms, it would make interest-only payments for a prescribed period, after which it would repay the entire principal in a "balloon" payment. The timely return of the principal is a critical, indeed defining, feature of the loan. The contract underscored that fact by requiring, in addition to other fees described by the majority, a 5% fee for late interest payments or principal repayment. Absent evidence to the contrary by the party properly bearing the burden of proof, we may presume that the substantial loan Dobson Bay sought would not have been made absent this assurance.

**¶49** The lender was not voracious. Before the balloon payment was originally due in 2009, the parties negotiated a three-year extension. As the new date approached, the parties negotiated over another extension but failed to reach agreement. Thereafter the note was sold to La Sonrisa which then commenced foreclosure proceedings.

**¶50** The majority applies two factors in determining whether the liquidated damages provision is "reasonable": the anticipated or actual loss caused by the breach, and the difficulty of proof of loss. *See* ¶ 12. Proving the provision is reasonable based on actual damages makes little sense in most instances, given that the point of a liquidated damages provision is to avoid litigation that requires proving actual damages. Accordingly, the proper inquiry "is whether the stipulated amount was, when all of the facts are considered, reasonable at the time of the contract and not whether it was reasonable with the benefit of hindsight." *Rampello*, 168 Ariz. at 300, 812 P.2d at 1118. At the same time, citing a comment to Restatement (Second) § 356, the majority notes that if the difficulty of forecasting actual damages is great, considerable latitude is appropriate in assigning liquidated damages. Although the difficulty of forecasting the amount of loss here

was great, the majority extends no such latitude.

¶51        The majority concludes that the lender is compensated for losses owing to a dilatory final payment elsewhere in the contract; specifically, through collection costs and foreclosure expenses.  *See* ¶ 25. Further, "[t]he loss of use of money would be compensated by continuing payments of regular interest plus default interest." *Id.*  Given that we have no idea the use to which the lender would have put the money had it been returned in a timely manner, that conclusion is conjecture, and illustrates precisely why liquidated damages provisions are preferable to protracted litigation and judicial second-guessing.

¶52        The main cost to the lender of failing to recover the loan corpus in a timely fashion, and the most difficult to calculate in advance, is opportunity cost.  La Sonrisa produced a declaration from Mitchel Medigovich, who has extensive experience as an Arizona trustee and real estate broker and originator.  He attests that when a borrower unilaterally extends the due date of a balloon payment, it imposes costs, including opportunity costs, upon the lender.  He likens the situation to a car rental company with a fixed fleet of cars.  If a renter unilaterally extends a rental even by one day, it diminishes fleet availability and the ability to provide new rentals, which has economic ripple effects throughout the enterprise.

¶53        Medigovich summarized the consequences of a late final payment and the purpose of a liquidated damages provision:

> Many lenders including banks make projections for expected and scheduled repayment of loans with which the lender makes interest payments to depositors, new loan commitments to prospective borrowers, bond payments to investors or to replenish capital reserves.  In any event, failure of the borrower to make any scheduled payment including a payment due upon maturity of the loan, particularly in the case of [a] large commercial loan such as in this case puts the lender at great risk of default of its own commitments . . . . Consequently, in most commercial transactions, the parties agree that if the Borrower fails to make a final payment of principal on the due date, (*a unilateral extension*), the economic impact to the Lender is incalculable and therefore a Late Fee is necessary as liquidated damages to the lender.

¶54        Such late fees are not a penalty because (1) "[a] lender with a

18

non-performing loan has significantly increased risk of recovery," (2), "*in addition to the expense of managing the non-performing asset,* the lender is denied the ability to reinvest expected . . . payments into new performing investments at current market rates" (emphasis added), and (3) "the lender may be at risk of defaulting on other loan commitments wherein funding is contemplated by the loan maturing." Whether any or all of those factors will occur in a particular loan context is unpredictable, and the cost of possible lost opportunities is inherently difficult to calculate.

¶55 Consequently, Medigovich observes, customary late fees for commercial transactions typically start at 4% or 5% and range up to 10%. In Medigovich's view, the 5% fee here was "perhaps below what is reasonable for the circumstances," which involved "a complex transaction with multiple properties as the collateral and multiple entities as the Borrower."[1]

¶56 Thus, even though La Sonrisa did not bear the burden of proving that the liquidated damages provision was reasonable, it supplied powerful evidence that the economic damages flowing from default or delayed final payment were potentially substantial, difficult to forecast or calculate, and not fully encompassed by other fees in the contract.

¶57 In contrast, Dobson Bay, the party that purportedly bore the burden of proof, presented by way of contravening evidence: absolutely

---

[1] Here, the lender sold the note to La Sonrisa. Amicus Arizona Private Lender Association explains the circumstances that give rise to such a sale:

> These lenders often have a significant portion of their total available funds invested at any given time. . . . Therefore, it is important to private lenders that their borrower repay on time to free up cash for new loans to keep the money moving and working for the business. . . . Thus when a borrower defaults on the repayment of the principal, the lender may be forced to sell the note to a collection agency at a discount. Late fees and default interest make the defaulted notes more attractive to collection firms, resulting in higher purchase prices for the notes, which helps the lender to protect against losses and keep its capital in the market.

nothing.[2]

¶58      Unsurprisingly, the trial court, which weighed the evidence presented by La Sonrisa and the absence thereof by Dobson Bay, concluded that the liquidated damages provision was enforceable.  The court of appeals, by contrast, held that as a matter of law, "absent unusual circumstances," a 5% liquidated damages provision in a contract like this is unenforceable.  *Dobson Bay*, 239 Ariz. at 140 ¶ 22, 366 P.3d at 1030.  The court cited neither law nor precedent for such a sweeping substantive pronouncement, although at least it provided a clear rule to which contracting parties could conform themselves.

¶59      The majority's opinion here is more legally grounded but also far more nebulous.  Is a default fee based on a percentage amount per se invalid because it does not vary with the duration of the default, even though amount-based late fees may not fully compensate for lost opportunity costs; or do the parties have to litigate every time to find out, which defeats the important purposes of liquidated damages clauses?  Either way, the economic consequences may be severe.  As La Sonrisa's expert attested, again unrebutted by the party ostensibly bearing the burden of proof, percentage-based liquidated damages provisions for late balloon payments are common components of commercial loan contracts.  Every single one is now in legal purgatory.

¶60      I prefer the approach taken by the New Jersey Supreme Court in *MetLife*, 732 A.2d at 499, which is more faithful to the Restatement and protective of freedom of contract.  *MetLife* involved a contract containing percentage-based late and default fees as liquidated damages, in addition to collection and various other fees.  *Id.* at 495–96.  At trial, MetLife's expert testified that a 5% late fee was the industry custom and standard, and was a reasonable forecast of costs including "lost investment opportunities."  *Id.* at 496.  Unlike here, the party challenging the provision actually produced contrary evidence.  *Id.* at 497.  The trial court found both the late fee and a 12.55% default fee represented reasonable liquidated damages.  *Id.*  The

---

[2] "Under a traditional common law analysis, the burden of proof regarding the enforceability of a liquidated damages clause rests squarely on the party seeking to set it aside."  Dimatteo, 38 Am. Bus. L.J. at 664–65.  "Although courts recognize this traditional allocation of burden of proof, in reality the onus seems to be upon the non-breaching party to prove reasonableness. . . .  In fact, some courts remain largely influenced by any disproportion between the stipulated amount and actual damages."  *Id.* at 667–68.  That is an accurate depiction of the majority analysis.

court of appeals reversed for reasons similar to those in the majority opinion here. *Id.* at 497–98.

**¶61** The Supreme Court reversed the court of appeals. It began by noting that a "need for close scrutiny arises from the possibility that stipulated damages clauses may constitute an oppressive penalty." *Id.* at 498. But the court should assess such provisions on a "continuum; the more uncertain the damages caused by a breach, the more latitude courts give the parties on their estimate of damages." *Id.* The court held that "liquidated damages provisions in a commercial contract between sophisticated parties are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness." *Id.* at 499.

**¶62** Applying those standards, the court concluded that the 5% late fee was reasonable because (1) "[i]t seems evident that late payments on larger loans would present a greater risk to the lender" given that they constitute a larger portion of a lender's portfolio, and (2) "damages resulting from the loss of investment opportunity increases with the size of the late installment payment," thus "a lender suffers both larger administrative and 'opportunity cost' damages when a borrower is late with a larger payment." *Id.* at 500. Because operational "costs are spread over an entire loan portfolio, it is difficult to identify specific damages attributable to the late payment or default of one specific borrower." *Id.*

**¶63** Given the difficulty in forecasting damages from late payment or default, the court looked to what was permitted by statute "and what constitutes common practice in a competitive industry." *Id.* The testimony that 5% was the industry standard was (as here) uncontradicted. *Id.* By contrast, cases in which fixed-percentage liquidated damages provisions were struck down "involved unusually large percentages or explicit evidence of a coercive intent." *Id.* at 501–02 (citing cases).

**¶64** The court also sustained the 12.55% default interest rate. "As with the costs of late payments, the actual losses resulting from a commercial loan default are difficult to ascertain." *Id.* at 503. "The lender cannot predict the nature or duration of a possible default," nor "is it possible when the loan is made to know what market conditions might be" at time of default or "what might be recovered from a sale of the collateral." *Id.* "For example, a lender cannot know what its own borrowing costs will be if a borrower defaults . . . nor accurately predict what economic return it will lose when the borrower fails to repay the loan on time." *Id.* Because the 12.55% default interest rate "appears to be a reasonable estimate of

potential damages, falls well within the range demonstrated to be customary, and because a stipulated damages clause negotiated between sophisticated commercial entities is presumptively reasonable," the court sustained it. *Id.*

¶65 Our Court likewise should presume that a liquidated damages provision negotiated by sophisticated parties is valid and conclude that the party bearing the burden of demonstrating its unreasonableness failed to sustain that burden in this case. Instead, we reward the party breaching the contract by removing a critical term to which it assented and, as a necessary consequence adding both insult and injury, require the non-breaching party to pay its attorney fees. Our decision will inevitably have a corrosive effect on the making and enforcement of contracts in Arizona, with predictable and substantial adverse economic consequences, notwithstanding that freedom of contract is enshrined in our organic law. With great respect to my colleagues, I dissent.